# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROBERT HOUCHIN, RICH PAYZANT, ROBERT MARINO, TROY AUER, PETER SYDOW, DUSTIN KERN, GARVIN EASTMAN, DANNY TOLIVER, TIMOTHY STOLZ and JOSEPH MBANG, individually and on behalf of all others similarly situated, | Case No.: |
| | JUDGE: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Houchin, Rich Payzant, Robert Marino, Troy Auer, Joe Mbang, Peter Sydow, Dustin Kern, Garvin Eastman, Danny Tolliver, and Timothy Stolz ("Plaintiffs"), individually and on behalf of the other members of the below-defined Classes hereby allege against Defendant General Motors LLC ("GM" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    NATURE OF THE CASE

1.    This class action lawsuit is brought by Plaintiffs seeking damages and equitable relief individually and on behalf of the other Class members, each of whom purchased or leased one or more vehicles equipped with a GM 6.2 Liter V8 EcoTec3 L87 engine (the "L87 Engine").

2.    GM equipped several vehicles with the L87 Engine, including the following makes and model years:

a)  2021 – 2024 Cadillac Escalade

b)  2021 – 2024 Cadillac Escalade ESV

c)  2019 – 2024 Chevrolet Silverado 1500

d)  2021 – 2024 Chevrolet Tahoe

e)  2021 – 2024 Chevrolet Suburban

f)  2019 – 2024 GMC Sierra 1500

g)  2021 – 2024 GMC Yukon

h)  2021 – 2024 GMC Yukon XL

Those vehicles listed above in which the L87 Engines were installed are defined herein as the "Class Vehicles."

3.      The L87 Engine is part of GM's Generation V small block engine family, otherwise known as "EcoTec3." The L87 is in the second generation of the EcoTec3 family of engines.[1]

4.      GM first introduced the L87 Engine in 2018, among the engine options in its all-new 2019 Chevrolet Silverado 1500 (fourth generation) and 2019 GMC Sierra 1500 (fourth generation).[2]

5.      As more fully explained below, the Class Vehicles were engineered to fail. GM failed to disclose the truth about these vehicles and failed to remedy the well-established defect in the Class Vehicles that were on the road.

6.      The Class Vehicles share a common, uniform, defect. They are equipped with the defective L87 Engine, which is highly susceptible to engine damage and sudden engine failure, resulting in loss of motive power and propulsion

---

[1]   *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, https://gmauthority.com/blog/gm/gm-engines/l87/ (last visited May 16, 2025) (attached as Exhibit B); *GM 6.2L EcoTec3 L86/L87 Engine Guide - Specs, Problems, Reliability*, MotorReviewer, https://www.motorreviewer.com/engine.php?engine_id=201 (last visited May 16, 2025) (attached as Exhibit C).

[2]   *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1.

during vehicle operation.[3] The defect arises from improper crankshaft dimensions and surface finish, along with bearings that are insufficiently robust to withstand the heat and friction generated in the L87 Engines (the "L87 Engine Defect"). The Engine Defect can cause catastrophic internal engine failure, leading to sudden loss of propulsion and increased risk of collision, injury, or death.

7.     As explained further below, there has been persistent and voluminous consumer outcry through the National Highway Traffic Safety Administration ("NHTSA") and various online forums that the Class Vehicles—particularly their engines—are defective.

8.     The NHTSA, Office of Defects Investigations ("ODI") opened an investigation into the issue on January 16, 2025. According to ODI's preliminary evaluation report summarizing consumer complaints and field reports, "[t]he complainants report a bearing failure that may result in either engine seizure or breaching of the engine block by the connecting rod. The complainants report that there is no detectability prior to the failure."[4]

---

[3] Part 573 Safety Recall Report No. 25V-274, NHTSA (Apr. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF, ("Recall Report") (attached as Exhibit D).

[4] ODI Investigation Opening Resume, No. PE25001, U.S. Dep't of Transp. (Jan. 16, 2025), https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf (attached as Exhibit E).

9.      An April 24, 2025, recall report identified "two primary root causes" for engine damage and failure in the L87 Engines: "(1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish."[5]

10.     The April 24, 2025 recall included the following vehicles:

•      2021 – 2024 Cadillac Escalade

•      2021 – 2024 Cadillac Escalade ESV

•      2021 – 2024 Chevrolet Silverado 1500

•      2021 – 2024 Chevrolet Tahoe

•      2021 – 2024 Chevrolet Suburban

•      2021 – 2024 GMC Sierra 1500

•      2021 – 2024 GMC Yukon

•      2021 – 2024 GMC Yukon XL

Those vehicles listed above in which the L87 Engines were installed are defined herein as the "Recall Vehicles." All the Recall Vehicles are included among the Class Vehicles.

11.     But, as alleged below, this Recall is egregiously inadequate.

---

[5] Recall Report, *supra* note 3.

12.     GM has known about the L87 Engine Defect and its attendant safety risks for *years*. GM has even conducted three former internal investigations into the defect, with the first one ***closed*** in February 2022, meaning it was launched well before that in 2021 or earlier.[6]

13.     Despite its knowledge, GM failed to disclose the defect, its root causes, and attendant safety risks to Class members prior to their purchasing or leasing of Class Vehicles. GM continued to cause the sale and lease of Class Vehicles with a known dangerous defect.

14.     Meanwhile, Class members placed trust in the Class Vehicles to safely transport themselves and other passengers, including young children.

15.     The existence of the L87 Engine Defect and its destructive outcome also significantly reduces the value of the Class Vehicles.

16.     Each current or former purchaser or lessee of a Class Vehicle unknowingly paid for a vehicle fitted with a defective L87 Engine that is highly susceptible to sudden engine failure, subjecting them and their vehicles to the harms and dangers described herein.

17.     Each of these current and/or former owners and/or lessees were damaged in that they paid more for their Class Vehicles than they would have paid

---

[6] Recall Report, *supra* note 3.

had they known about the defect that GM failed to disclose, or they would not have purchased or leased their Class Vehicles at all.

## II.   <u>JURISDICTION AND VENUE</u>

18.   This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than Defendant.

19.   The Court has personal jurisdiction over Defendant because it is headquartered in Michigan.

20.   Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.   <u>PARTIES</u>

### A. Plaintiffs

21.   **Plaintiff Robert Houchin** is domiciled in Nevada.

22.   Mr. Houchin owns a 2022 Cadillac Escalade equipped with the 6.2L L87 Engine. Mr. Houchin purchased his Escalade new from Corwin Buick GMC in Reno, Nevada in 2022.

23.     Prior to purchasing his 2022 Escalade, Mr. Houchin spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

24.     GM failed to disclose the L87 Engine Defect to Mr. Houchin before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Houchin therefore purchased his 2022 Escalade with the incorrect understanding that it would be a safe and reliable vehicle.

25.     Had GM disclosed the L87 Engine Defect, Mr. Houchin would not have purchased his 2022 Escalade or certainly would have paid less for it.

26.     **Plaintiff Rich Payzant** is domiciled in Massachusetts.

27.     Mr. Payzant owns a 2023 GMC Yukon Delani 1500 equipped with the 6.2L L87 Engine. Mr. Payzant purchased his 2023 Yukon Delani new from Quirk Chevrolet in Braintree, Massachusetts in 2023.

28.     Prior to purchasing his 2023 Yukon Denali, Mr. Payzant spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

29.     GM failed to disclose the L87 Engine Defect to Mr. Payzant before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Payzant therefore purchased his 2023 Yukon Denali with the incorrect understanding that it would be a safe and reliable vehicle.

30.     Had GM disclosed the L87 Engine Defect, Mr. Payzant would not have purchased his 2023 Yukon Denali or certainly would have paid less for it.

31.     **Plaintiff Robert Marino** is domiciled in Massachusetts.

32.     Mr. Marino owns a 2024 Yukon XL AT4 equipped with the 6.2L L87 Engine. Mr. Marino purchased his 2024 Yukon XL new from Albrecht Buick GMC in Wakefield, Massachusetts in 2024.

33.     Prior to purchasing his 2024 Yukon XL, Mr. Marino spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

34.     GM failed to disclose the L87 Engine Defect to Mr. Marino before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Marino therefore purchased his 2024 Yukon XL with the incorrect understanding that it would be a safe and reliable vehicle.

35.     Had GM disclosed the L87 Engine Defect, Mr. Marino would not have purchased his 2024 Yukon XL or certainly would have paid less for it.

36.     **Plaintiff Troy Auer** is domiciled in Florida.

37.     Mr. Auer owns a 2021 GMC Sierra equipped with the 6.2L L87 Engine. Mr. Auer purchased his 2021 GMC Sierra new from Dixie Buick GMC in North Fort Myers, Florida in 2022.

38.     Prior to purchasing his 2021 GMC Sierra, Mr. Auer spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

39.     GM failed to disclose the L87 Engine Defect to Mr. Auer before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Auer therefore purchased his 2021 GMC Sierra with the incorrect understanding that it would be a safe and reliable vehicle.

40.     Had GM disclosed the L87 Engine Defect, Mr. Auer would not have purchased his 2021 GMC Sierra or certainly would have paid less for it.

41.     **Plaintiff Joe Mbang** is domiciled in New York.

42.    Mr. Mbang owns a 2021 Cadillac Escalade equipped with the 6.2L L87 Engine. Mr. Mbang purchased his 2021 Escalade used from Garber Randall Buick GMC in Ontario County, New York in 2025.

43.    Prior to purchasing his 2021 Escalade, Mr. Mbang spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

44.    GM failed to disclose the L87 Engine Defect to Mr. Mbang before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Mbang therefore purchased his 2021 Escalade with the incorrect understanding that it would be a safe and reliable vehicle.

45.    Had GM disclosed the L87 Engine Defect, Mr. Mbang would not have purchased his 2021 Escalade or certainly would have paid less for it.

46.    **Plaintiff Dustin Kern** is domiciled in Indiana.

47.    Mr. Kern owned a 2021 GMC Yukon equipped with the 6.2L L87 Engine. Mr. Kern purchased his 2021 Yukon new from Paul-Richard GM Center, Peru, Indiana in 2021.

48.    Prior to purchasing his 2021 Yukon, Mr. Kern spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's

safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

49.     GM failed to disclose the L87 Engine Defect to Mr. Kern before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Kern therefore purchased his 2021 Yukon with the incorrect understanding that it would be a safe and reliable vehicle.

50.     Had GM disclosed the L87 Engine Defect, Mr. Kern would not have purchased his 2021 Yukon or certainly would have paid less for it.

51.     Because of the engine failure, Mr. Kern traded the 2021 Yukon for a 2023 Yukon from Paul-Richard GM Center, Peru, Indiana in 2023.

52.     The 2021 Yukon's value was diminished as a result of the L87 engine failure at trade.

53.     Prior to purchasing his 2023 Yukon, Mr. Kern spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

54.     GM failed to disclose the L87 Engine Defect to Mr. Kern before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Kern

therefore purchased his 2023 Yukon with the incorrect understanding that it would be a safe and reliable vehicle.

55.     Had GM disclosed the L87 Engine Defect, Mr. Kern would not have purchased his 2023 Yukon or certainly would have paid less for it.

56.     **Plaintiff Peter Sydow** is domiciled in Texas.

57.     Mr. Sydow owned a 2024 Chevrolet Silverado equipped with the 6.2L L87 Engine. Mr. Sydow purchased his 2024 Chevrolet Silverado new from Northside Chevrolet in San Antonio, Texas in 2024.

58.     Prior to purchasing his 2024 Chevrolet Silverado, Mr. Sydow spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

59.     GM failed to disclose the L87 Engine Defect to Mr. Sydow before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Sydow therefore purchased his 2024 Chevrolet with the incorrect understanding that it would be a safe and reliable vehicle.

60.     Had GM disclosed the L87 Engine Defect, Mr. Sydow would not have purchased his 2024 Chevrolet Silverado or certainly would have paid less for it.

61.    Because of the L87 Engine Defect, Mr. Sydow traded the 2024 Chevrolet Silverado for a 2025 Chevrolet Silverado from Northside Chevrolet in San Antonio, Texas in May of 2025.

62.    The 2024 Chevrolet Silverado's value was diminished as a result of the L87 Engine Defect at trade.

63.    Prior to purchasing his 2025 Chevrolet Silverado, Mr. Sydow spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

64.    GM failed to disclose the systemic L87 Engine Defect to Mr. Sydow before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Kern therefore purchased his 2025 Silverado Yukon with the incorrect understanding that it would be a safe and reliable vehicle.

65.    Had GM disclosed the systemic L87 Engine Defect, Mr. Sydow would not have purchased his 2025 Silverado or certainly would have paid less for it.

66.    **Plaintiff Garvin Eastman** is domiciled in New Hampshire.

67.    Mr. Eastman owned a 2021 GMC Sierra equipped with the 6.2L L87 Engine. Mr. Eastman purchased his 2021 Sierra used from Blasius Boston, Holliston, Massachusetts in 2024.

68.    Prior to purchasing his 2021 Sierra, Mr. Eastman spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

69.    GM failed to disclose the L87 Engine Defect to Mr. Eastman before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Eastman therefore purchased his 2021 Sierra with the incorrect understanding that it would be a safe and reliable vehicle.

70.    Had GM disclosed the L87 Engine Defect, Mr. Eastman would not have purchased his 2021 Sierra or certainly would have paid less for it.

71.    **Plaintiff Timothy Stolz** is domiciled in North Dakota.

72.    Mr. Stolz owns a 2023 GMC Sierra equipped with the 6.2L L87 Engine. Mr. Stolz purchased his new 2023 Sierra from Don Dondelinger GMC in Bemidji, Minnesota.

73.    Prior to purchasing his 2023 Sierra, Mr. Stolz spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

74.     GM failed to disclose the L87 Engine Defect to Mr. Stolz before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Stolz therefore purchased his 2023 Sierra with the incorrect understanding that it would be a safe and reliable vehicle.

75.     Had GM disclosed the L87 Engine Defect, Mr. Stolz would not have purchased his 2023 Sierra or certainly would have paid less for it.

76.     **Plaintiff Danny Toliver** is domiciled in Virginia.

77.     Mr. Toliver owned a 2023 GMC Yukon equipped with the 6.2L L87 Engine. Mr. Toliver purchased his 2023 Yukon new from Brandywine Motors in Brandywine, Maryland in October 2023.

78.     Prior to purchasing his 2023 Yukon, Mr. Toliver spoke with a sales representative at the dealership, reviewed a sales brochure promoting the vehicle's safety and reliability, and reviewed information about the vehicle on GM's website. At no point prior to or at the time of purchase, did GM disclose the L87 Engine Defect.

79.     GM failed to disclose the L87 Engine Defect to Mr. Toliver before he purchased his vehicle, despite GM's knowledge of the defect, and Mr. Toliver therefore purchased his 2023 Yukon with the incorrect understanding that it would be a safe and reliable vehicle.

80.    Had GM disclosed the L87 Engine Defect, Mr. Toliver would not have purchased his 2023 Yukon or certainly would have paid less for it.

**B. Defendant**

81.    General Motors LLC ("GM") is a Delaware limited liability company, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of Delaware and Michigan.  The sole member and owner of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in the State of Michigan, and is a citizen of Delaware and Michigan.

82.    At all relevant times to this action, GM designed, manufactured, distributed, sold, leased, serviced and warranted the Chevrolet, GMC, and Cadillac branded Class Vehicles throughout the United States.[7]

---

[7] *Our Brands*, General Motors, https://www.gm.com/gm-brands (last visited May 16, 2025) (attached as Exhibit I).

## IV.    FACTUAL ALLEGATIONS

### A. GM Introduces the L87 Engine in 2018, as Part of the EcoTec3 Engine Family, Second Generation.

83.    The L87 Engine is a 6.2-liter, eight-cylinder engine used in a range of GM trucks, vans, and sports utility vehicles. It features a "push-rod" design in a "V" configuration.[8] The L87 Engine is part of "EcoTec3," GM's Generation V small block family of gas engines, which replaced the Vortec line of engines.[9]

84.    The L87 Engine is used across GM's full-size trucks and SUVs, including the Chevrolet Silverado, GMC Sierra, Chevrolet Tahoe, Suburban, and GMC Yukon. All Class Vehicles share this same L87 Engine, including its designs, parts, and manufacturing process. The Engine Defect described herein is thus common to all Class Vehicles.

85.    The L87 Engine is depicted in the following image:[10]

---

[8] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1; *GM EcoTec3 Engines*, GM Authority, https://gmauthority.com/blog/gm/gm-engines/ecotec3/ (last visited May 16, 2025) (attached as Exhibit K); *Trio of New EcoTec3 Engines Powers Silverado and Sierra*, Automotive World (Dec. 13, 2012), https://www.automotiveworld.com/news-releases/trio-of-new-ecotec3-engines-powers-silverado-and-sierra/ (attached as Exhibit J).

[9] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1; *GM EcoTec3 Engines*, GM Authority, *supra* note 8; *Trio of New EcoTec3 Engines*, *supra* note 8.

[10] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1.



86.     The first generation of the EcoTec3 engine family debuted roughly a decade ago, in the 2014 model year Chevrolet Silverado 1500 and GMC Sierra 1500.

87.     The new Ecotec3 engine family was heralded as a complete overhaul of its predecessor with "three state-of-the-art technologies – direct injection, cylinder deactivation and continuously variable valve timing – to make the most of power, torque and efficiency across a broad range of operating conditions."[11]

88.     Jordan Lee, the chief engineer and program manager, endorsed the new EcoTec3 engine family at length, stating, "[t]his is technology no other truck maker can match, and we offer it in every one of our EcoTec3 engines, for every one of our

---

[11] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1; *GM EcoTec3 Engines*, GM Authority, *supra* note 8; *Trio of New EcoTec3 Engines*, *supra* note 8.

customers," and, "[w]e believe these are the most technologically advanced engines ever offered in light-duty pickups, and they are 100 percent truck – specifically designed for the way customers use trucks in the real world."[12]

89.     The L87 Engine is part of the second generation of the EcoTec3 family, and it directly succeeds the 6.2-liter V8 L86 engine.[13] The second generation EcoTec3 engines were designed to further optimize fuel efficiency,[14] and were said to pioneer "industry-first cylinder deactivation technology."[15]

90.     GM first introduced the L87 Engine in 2018, among the engine options in the 2019 Chevrolet Silverado 1500 (fourth generation) and 2019 GMC Sierra 1500 (fourth generation).[16]

---

[12] *Trio of New EcoTec3 Engines*, *supra* note 8.

[13] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1; *GM 6.2L EcoTec3 L86/L87 Engine Guide*, MotorReviewer, *supra* note 1.

[14] Nora Naughton, *New Silverado gets 2.7-liter turbo four, updated V-8s*, The Detroit News (May 18, 2018), https://www.detroitnews.com/story/business/autos/general-motors/2018/05/18/new-chevy-silverado-engines/35046583/ (attached as Exhibit L).

[15] John Gilbert, *Gas Mileage With a Punch! 355-Horse 2019 L84 5.3 Chevy V-8 Can Burn E85*, MotorTrend (May 29, 2018), https://www.motortrend.com/news/1805-gas-mileage-with-a-punch-355-horse-2019-l84-5-3-chevy-v-8-can-burn-e85 (attached as Exhibit M).

[16] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1.

91.     Chief engineer Jordan Lee again endorsed the second generation of EcoTec3 engines, including the L87 Engine, stating: "The increased variability of dynamic fuel management means the engine will operate more often with a reduced number of cylinders, which saves fuel across the board. Better yet, the transitions are transparent, and because the system is torque-based, you've always got that satisfying feeling of power on demand that comes from Chevy's Gen V small block V-8 engines."[17]

92.     When unveiling the 2019 Chevrolet Silverado pickup truck at the 2018 Detroit auto show, its Chief Engineer Tim Herrick endorsed the new 5.3- and 6.2-liter V8 engines, stating: "Our V-8 is an iconic engine for us, and we have made it even better."[18]

93.     GM continued to equip later model years of the Chevrolet Silverado 1500 and GMC Sierra 1500 with L87 Engines. Beginning with model year 2021,

---

[17] Naughton, *supra* note 14.

[18] Naughton, *supra* note 14; *Nora Naughton & Henry Payne, Chevy Silverado swings first blow in pickup wars* (Jan. 13, 2018), https://www.detroitnews.com/story/business/autos/detroit-auto-show/2018/01/13/new-chevy-silverado-premieres/109424774/ (attached as Exhibit N).

GM expanded the L87 Engines to the Cadillac Escalade; Chevrolet Suburban and Tahoe; and GMC Yukon and Yukon XL.[19]

94.    Upon information and belief, prior to the April 2025 recall, vehicles equipped with the L87 Engine used 0W-20 motor oil from the factory, a relatively thin motor oil.[20]

**B. The Crankshaft and Connect Rods are Vital for Proper Engine Operation**

95.    The crankshaft and connecting rods are internal engine components located near the bottom of the engine.[21] They are essential components of the engine's internal combustion process, tasked with converting the explosive force of combustion into the rotational power needed to drive the vehicle. They are responsible for converting the up-and-down motion of the pistons (caused by combustion) into rotational motion that ultimately drives the wheels.

---

[19] *GM 6.2 Liter V8 EcoTec3 L87 Engine*, GM Authority, *supra* note 1.

[20] Larry Carley, *GM 6.2L L87 V8 Engine Failures & Recall*, AA1 Car, https://www.aa1car.com/library/engine_failure_gm_62.htm (last visited May 16, 2025) (attached as Exhibit G).

[21] Zach Butler, *GM Recalls 6.2L V8-Equipped 2021-2024 Chevy Silverado, GMC Sierra Trucks & Full-Size SUVs to Address Engine Failures*, The Fast Lane Truck (April 25, 2025), https://tfltruck.com/2025/04/gm-recalls-6-2-v8-chevy-silverado-gmc-sierra-for-engine-failures/ (attached as Exhibit O).

96.     These parts endure extreme conditions during normal vehicle operation, including high combustion pressures, intense heat, and rapid rotational forces. Because of the critical role they play and the severity of the stresses involved, the design, material composition, and manufacturing quality of the crankshaft and connecting rods must meet the highest engineering standards to ensure safe and reliable engine performance.

97.     Even minor deficiencies in the crankshaft or connecting rods—whether due to material weaknesses, design flaws, improper forging, surface defects, or manufacturing variances—can critically undermine the integrity of the engine. Under operating conditions, these deficiencies can cause the components to crack, warp, or fracture without warning.

98.     "A crankshaft is a mechanical part that transforms the reciprocating movement of the piston into rotational motion and turns the vehicle wheels. It is connected to the piston through a connecting rod."[22]

---

[22] Engineer Waqar, *What Is A Crankshaft? How does a Crankshaft Work?*, Mechanical Boost, https://mechanicalboost.com/crankshaft/ (last visited May 16, 2025) (attached as Exhibit P).

99.     In turn, the pistons travel up and down inside the engine's combustion chamber, transferring energy to the crankshaft via a connecting rod.[23]

100.    "The connecting rod is a component of the reciprocating engine that connects the crankshaft to the piston." Its main function "is to take the reciprocating motion from the piston, convert it into rotary motion and transfer it to the crankshaft." Therefore, the crankshaft "must be mechanically strong." Insufficient lubrication oil as well as debris in the engine can contribute rod damage. [24]

101.    A "rod bearing" or "engine bearing" is "a split-sleeve type of bearing (meaning it has two separate semicircular halves or shelves) that keeps the crankshaft and connecting rod in place as they rotate.

102.    The bearing's top half has a pinhole that keeps the crankshaft lubricated, allowing it to spin freely inside the bearing without generating excessive

---

[23] Engineer Waqar, *What Is A Piston? How does a Piston Work?*, Mechanical Boost, https://mechanicalboost.com/piston/ (last visited May 16, 2025) (attached as Exhibit Q).

[24] Engineer Waqar, *What Is Connecting rod? How does a Connecting rod work?*, Mechanical Boost, https://mechanicalboost.com/connecting-rod/ (last visited May 16, 2025) (attached as Exhibit R).

friction and heat. The rod bearings provide are key to the functionality of these critical rotating parts of an engine.[25]

103.   The crankshaft, connecting rod, and bearings work together to provide essential engine functions:[26]



104.   Bearings function under the principle of Hydrodynamic Lubrication, which is defined as a lubrication regime that occurs between sliding surfaces when

---

[25] Richard McCuistian, *What are Rod Bearings? Causes & Symptoms of Failure Explained*, CarParts.com (June 15, 2024), https://www.carparts.com/blog/what-are-rod-bearings-causes-symptoms-of-failure-explained/?msockid=38767612e55363b5170c62f2e4e6626f (attached as Exhibit S). *See also* Richard McCuistian, *What Are Engine Bearings and Why Are They Important?*, CarParts.com (Jan. 23, 2025), https://www.carparts.com/blog/what-are-engine-bearings-and-why-are-they-important/?srsltid=AfmBOooi4xbaeGRfGxpUsRmkDLFNrUNG8zVR-P9hvW4vHam6CElWjj3V (attached as Exhibit T).

[26] *Id.*

a full film of oil supports and creates a working clearance. Direct metal-to-metal contact between rotating parts shouldn't happen because of the thin protective oil film between two surfaces. These form a hydrodynamic wedge capable of supporting large loads.

105.   Damaged or faulty connecting rod bearings can result in "rod knock," a kock or tap noise from the engine that indicates a change in the clearance between the connecting rod, and crankshaft.[27]

106.   When a bearing loses lubrication and/or overheats, it can stick to the crankshaft (a "spun" bearing) and/or it can break.

107.   Spun and/or broken bearings can prevent the crankshaft from rotating smoothly, leading to a seized engine.

108.   Spun and/or broken bearings can also lead to broken connecting rods.

109.   Both seized engines and broken connecting rods are commonly reported occurrences in the L87 Engines.

## C. The L87 Engines Are Defective

110.   According to the April 2025 safety recall report, the L87 Engine Defect is attributable to at least two component parts of the L87 Engine: the crankshaft and the connecting rod.

---

[27] McCuistian, *What are Rod Bearings?*, *supra* note 25.

111.   Specifically, GM admitted the problem results from defects with the dimensions and surface finish of the crankshaft, and/or rod bearing damage caused by sediment on the connecting rods and crankshaft oil galleries. [28]

112.   Due to the defect, the L87 Engines are defective and can suffer from a loss of lubrication and overheating – both of which will totally debilitate an engine.

113.   However, the Defect is also caused by inadequate rod bearings (made of aluminum) and other components that are not capable of operating in the harsh conditions to which they are subjected, such as excessive heat and repetitive use/wear from expected use conditions, including, but not limited to, idle stops and stop-and-go traffic.

114.   In other words, the bearings and other components installed in the L87 Engine are insufficiently robust to withstand the heat and friction generated in the L87 Engine environment, resulting in spun or broken bearings, and the widely reported engine failures.

115.   When these critical components cannot dissipate excessive engine heat, the resulting loss of lubrication inevitably leads to bearing degradation/destruction and crankshaft seizure, ultimately causing catastrophic engine failure.

---

[28] Recall Report, *supra* note 3.

116.   Sudden loss of motive power and propulsion during vehicle operation, as is the case with the L87 Engine Defect, significantly increases the risk of crashes and injuries. This is particularly true when the vehicle is being driven at high speeds, in multilane streets, or in high traffic areas.

117.   Sudden engine failure leaves Class Vehicles and their occupants stranded in hazardous traffic conditions, dangerous weather conditions, and/or remote locations. Plaintiffs and Class members therefore purchased or leased vehicles that are unsafe to drive and subject them to serious risk of injury or death.

118.   GM admitted there are at least 12 crashes and 12 injuries related to the Defect, and that it is aware of at least 14,332 cases of loss of propulsion.

119.   The dangers associated with sudden engine failure are exacerbated where, as here, it is often not preceded by any warning light or signal prior to engine failure.

120.   According to the April 2025 safety recall report, drivers of Class Vehicles "*may*" be alerted prior to engine failure by "(a) knocking, banging, or other unusual engine noises; (b) illumination of the check engine light; and/or (c) engine-performance issues, including hesitation, high RPMs, abnormal shifting, reduced propulsion, or a no-start condition."[29]

---

[29] Recall Report, *supra* note 3.

121.   Many of these potential "warnings" are overly vague, and the list is too varied to represent an adequate warning to drivers of Class Vehicles that sudden engine failure is impending.

122.   Furthermore, even if the Class Vehicles did adequately warn drivers of impending engine failure, any such warnings would do nothing to prevent the full scope of harm caused by the L87 Engine failure defect.

123.   The Engine Defect is present from the time of manufacture. However, the symptoms may not manifest immediately. Due to the nature of the Engine Defect and the extreme stresses that accumulate over time, many owners may not experience any outward signs of the problem until the engine has already suffered internal damage—often after many thousands of miles of use.

124.   Because the Engine Defect's failure mechanism is latent, consumers had no reasonable ability to detect the defect through ordinary maintenance or observation. As a result, the fact that an owner has not experienced engine failure yet does not mean the Class Vehicle was free of the defects at issue. Nor were owners at fault for failing to present their Class Vehicles for repair; the Engine Defect was inherently concealed and progressive.

### D. GM's Market Actions and Purported Remedy are Inadequate

125.    Only a few, lucky Class members on the road will get a new engine, after waiting months (or longer) for parts to be available. But the few, lucky Class members who receive new engines are receiving equally defective engines.

126.    GM admits such, as GM has not redesigned the rod bearings or other components. Instead, the only difference is that the connecting rods and crankshafts were built "after the suppliers' suspect manufacturing window."

127.    For the bulk of the Class, who will never be offered a new engine, the remedy falls even shorter. For these vehicles, GM instructed dealers to replace the stock oil (0W-20) with a higher viscosity oil (0W-40), replace the oil cap with one that is marked to indicate the higher viscosity oil is now required, and replace the oil filters on those vehicles passing this inspection.

128.    However, this oil replacement procedure fails to provide a complete and adequate remedy for the Class Vehicles with the L87 Engine Defect, as GM has not replaced the defective rod bearings or other components with redesigned ones that can withstand the engines' operating conditions.

129.    GM still has yet to notify consumers directly of the L87 Engine failure defect and its associated safety risks, exposing Class members, occupants of their vehicles, and other drivers at risk.

130. And GM has not offered to compensate Plaintiffs or Class members for the diminished vale of their vehicles due to the widespread negative press associated with this unprecedented market action.

131. Furthermore, there is a nationwide backorder on replacement engines causing lengthy repair delays. As such, Class Vehicles owners are left without a sufficient remedy, and their vehicles are left to continue suffering from the L87 Engine Defect. In fact, some report that their vehicles will not be repaired for at least six months, leaving them without any transportation.

## E. Consumers Experiences Reveal a Uniform Defect With Catastrophic Potential.

132. Voluminous consumer complaints to NHTSA, as well as other popular consumer forums demonstrate the breadth and severity of sudden engine failure among vehicles equipped with GM's 6.2 Liter V8 EcoTec3 L87 engine.

*Consumer complaints to NHTSA.*

133. On information and belief, GM regularly monitors consumer complaints to NHTSA regarding its vehicles.

134. GM tracks trends in NHTSA consumer complaints related to potential defects and attendant safety risks.

135. Countless complaints to NHTSA reported experiences of engine failure that placed consumers and others at alarming levels of risk, including catastrophic

engine failure in an intersection with a child in the car[30], engine failure while driving uphill causing the vehicle to roll backwards,[31] and a vehicle that experienced catastrophic engine failure *three* times at only 23,000 miles.[32]

136. On December 3, 2021, a consumer in Pipestem, West Virginia experienced an engine failure event in their 2021 GMC Sierra 1500, equipped with a the L87 Engine. The vehicle was purchased only seven months prior and had only 15,000 miles. While driving down the interstate, the engine made noises and without any warning had a "noticeable loss of power." They reported the event to GM, who referred them to the nearest GM dealer. The consumer reported, "I feel that the vehicle is unsafe to drive and could cause a accident if it locks up on the highway. … I feel that GM is ignoring a known issue and that this will result in accidents and possible loss of life."[33] GM would not issue a safety recall on the L87 Engine until three and a half years later.

---

[30]  Consumer Complaint No. 11639900, NHTSA (Jan. 31, 2025), https://www.nhtsa.gov/?nhtsaId=11639900 (attached as Exhibit A).

[31]  Consumer Complaint No. 11300819, NHTSA (Jan. 21, 2020), https://www.nhtsa.gov/?nhtsaId=11300819 (attached as Exhibit A).

[32]  Consumer Complaint No. 11639142, NHTSA (Jan. 28, 2025), https://www.nhtsa.gov/?nhtsaId=11639142 (attached as Exhibit A).

[33]  Consumer Complaint No. 11442943, NHTSA (Dec. 6, 2021), https://www.nhtsa.gov/?nhtsaId=11442943.



**December 6, 2021** NHTSA ID NUMBER: 11442943

**Components: ENGINE**

**NHTSA ID Number:** 11442943

**Incident Date** December 3, 2021

**Consumer Location** PIPESTEM, WV

**Vehicle Identification Number** 3GTP9EEL0MG****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | 2021 GMC Sierra 1500 AT4 6.2L engine, Little over 15000 |
| FIRE | No | miles, Purchesed May 2021. Drivining down the interstate with |
| INJURIES | 0 | out warning, engine starting making back fire sounding noise, |
| DEATHS | 0 | with a noticeable loss of power, I requested On Star to do a |

vehicle diagnostics, no faults was reported, No check engine
light, temp was normal, oil pressure normal. The noise was off
and on at first and then remained constant. Fortunately I was
able to make it safely back to my residents. I parked the
vehicle and did a scan code and it did not have any codes, I did
a pending code scan and it had a P0300 code. I started the
engine and the noise was louder at first and then got quiter
after about 15 seconds of running the check enging light came
on I shut the engine down and did another scan it gave me a
P0302 code. I feel that the vehicle is unsafe to drive and could
cause a accident if it locks up on the highway. I contacted GM
and reported the issue, they said take it to a near by GM dealer,
I told them that I felt the vehicle was unsafe to drive and they
tried to contact me with road side assistance but I was unable
to get anyone on the phone. I feel that GM is ingnoring a known
issue and that this will result in accidents and possible loss of
life.

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| GMC | SIERRA 1500 | 2021 |

137. On June 10, 2022, another consumer in Corpus Christi, Texas experienced an engine failure event in their 2021 GMC Yukon XL, with only 17,067 miles. The consumer was traveling on the highway when "the vehicle suddenly and without warning lost power." The consumer pulled onto the shoulder of the highway, where the vehicle failed to restart. The vehicle was towed to a dealer, where it presented P0016, the same problem code that would be included in the recall service instructions three years later. The dealer inspected the vehicle and found "internal

engine bearing materiel in oil indicating internal mechanical failure," and "found bearings spun causing catastrophic engine failure," as well as a discolored crankshaft from "extreme heat."[34]



August 1, 2022 NHTSA ID NUMBER: 11477035

**Components: POWER TRAIN, ENGINE**

**NHTSA ID Number:** 11477035

**Incident Date** June 10, 2022

**Consumer Location** CORPUS CHRISTI, TX

**Vehicle Identification Number** 1GKS2JKL5MR****

**Summary of Complaint**

| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

While traveling at highway speeds, the vehicle suddenly and without warning lost power. All gauges remained in the normal range. After pulling on to the shoulder of a highway and turning the vehicle off, the vehicle would not start. After being towed the dealership, the vehicle would not power up. Dealership checked DTCS and found code P0016 Crankshaft Position Sensor and Intake/Single Camshaft Position Sensor Correlation. Dealership inspected wiring for chaffing and tested camshaft position sensor circuitry and all found in normal condition. Dealership followed document ID: 5646662 diagnostic procedure inspecting camshaft position sensor and camshaft actuator solenoid valve for incorrect installation or damage. While inspecting, dealership found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun causing catastrophic engine failure. Crankshaft main bearing cap #3 also found discolored from extreme heat. Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage The vehicle only had 17,067 miles.

**1 Affected Product** –

**Vehicle**

| MAKE | MODEL | YEAR |
| --- | --- | --- |
| GMC | YUKON XL | 2021 |

---

[34]   Consumer Complaint No. 11477035, NHTSA (Aug. 1, 2022), https://www.nhtsa.gov/?nhtsaId=11477035.

138.   On January 22, 2023, a consumer in Medinah, Illinois experienced an engine failure event in their 2022 GMC Sierra 1500, with only 20,000 miles. The engine "seized up while exiting the highway." A GM dealer determined an entire engine replacement was required, and a service manager said that "it was a *common problem with the 6.2 engine*."[35]



139.   On October 17, 2023, a consumer in Carmel, Indiana experienced an engine failure in their 2022 Chevrolet Tahoe. The vehicle was traveling at 70 miles per hour on the interstate and carrying a family of 5, *including 2 children and an*

---

[35]   Consumer Complaint No. 11637538, NHTSA (Jan. 21, 2025), https://www.nhtsa.gov/?nhtsaId=11637538.

*infant*. The consumer reported that the vehicle seized, followed by flashing on the dashboard. There was "no warning at all that the car had problems." They were forced to shelter "on the shoulder of a busy highway" unable to restart the vehicle, requiring police assistance to deter traffic. The dealer determined that the engine had seized and a full engine replacement was required. Although it was under warranty, replacement engines were backordered. The consumer reported it was a "widespread problem with these particular engines" and that there were several other Tahoes at the dealer with the same problem.[36]

---

[36] Consumer Complaint No. 11551432, NHTSA (Oct. 23, 2023), https://www.nhtsa.gov/?nhtsaId=11551432.



October 23, 2023 NHTSA ID NUMBER: 11551432
**Components: ENGINE**

**NHTSA ID Number:** 11551432

**Incident Date** October 17, 2023

**Consumer Location** CARMEL, IN

**Vehicle Identification Number** 1GNSKRKL4NR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | Our family of 5 (including 2 children and an infant) was driving |
| FIRE | No | 70 mph westbound on Interstate 40 east of Knoxville, TN when |
| INJURIES | 0 | our 2022 Tahoe RST engine seized. For a few seconds, we had |
| DEATHS | 0 | no steering, braking or acceleration and the dashboard began |

flashing. After a few seconds, the car shifted itself into the
neutral gear and we were able to brake on the shoulder of a
busy highway. We were unable to restart the car. We called the
police as well as AAA. The police came and sat behind us to
deter oncoming cars to changes lanes. AAA came and towed
our car to Reeder Chevrolet dealership in Knoxville, TN. There,
it was determined that our engine had seized and needs to be
replaced under warranty However, there is a backorder on the
engine, and we are now driving a rental car. There are several
other Tahoes in their service department with similar
circumstances in need of a 6.2L ecotech V8 engine. There was
no warning at all that the car had problems. Up until this point,
there were no issues. I believe there is a widespread problem
with these particular engines and this should be addressed on
a national level. Our lives were at risk.

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CHEVROLET | TAHOE | 2022 |

140.  On May 16, 2024, a consumer in Missouri experienced an engine failure in their 2022 Cadillac Escalade with only 25,000 miles. The consumer reported total engine failure while they were driving up hill and passing a semi at 60 miles per hour. The failure was not accompanied by any warning lights. The consumer was forced to shelter on the shoulder "at the crest of a large hill, at the end of a merge lane. It was a very dangerous place to stop." The dealer confirmed that the entire engine required replacement and stated that it was "a common problem

with that model engine (6.2 L)" and to expect a delay in finding a replacement engine.[37]



141. On April 7, 2024, a consumer in St. Louis, Missouri experienced an engine failure in their 2023 GMC Sierra 1500 *while towing a two-horse trailer carrying a horse* in northern Arkansas. The consumer reported the "6.2 engine suddenly locked up causing us to pull on to the shoulder of the road – nearly causing an accident." The vehicle had only 23,000 miles. The GMC dealer replaced the entire

---

[37] Consumer Complaint No. 11596119, NHTSA (June 24, 2024), https://www.nhtsa.gov/?nhtsaId=11596119.

engine under warranty with a "used rebuilt engine." According to the consumer, engine failure in the L87 Engines was no surprise to the dealer: "The dealer had handled *a number of 6.2 engine failures prior to this on*e."[38]



January 18, 2025 NHTSA ID NUMBER: 11636841

**Components: ENGINE**

**NHTSA ID Number:** 11636841

**Incident Date** April 7, 2024

**Consumer Location** Unknown

**Vehicle Identification Number** 3GTUUGEL7PG****

**Summary of Complaint**

| CRASH | No | While driving along [XXX] in northern Arkansas the on [XXX] my 2023 GMC Sierra Denali's 6.2 engine suddenly locked up causing us to pull on to the shoulder of the road - nearly causing an accident. The vehicle had 23000 miles on it at the time. We were towing a two horse trailer with one horse aboard. At our expense, we had the vehicle and trailer towed back to St. Louis, MO then to O'Fallon Buick GMC. The dealer replaced the entire engine under warranty with a used rebuilt engine. They have omitted the engine replacement from the vehicle history report in CARFAX. The dealer had handled a number of 6.2 engine failures prior to this one. The vehicle was serviced well within factory guidelines at the dealer. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product** -

**Vehicle**

| MAKE | MODEL | YEAR |
| --- | --- | --- |
| GMC | SIERRA 1500 | 2023 |

142.   On September 5, 2024, a consumer in Chantilly, Virginia experienced an engine failure event in their 2023 GMC Sierra 1500, with only 22,000 miles. The

---

[38]   Consumer Complaint No. 11636841, NHTSA (Jan. 18, 2025), https://www.nhtsa.gov/?nhtsaId=11636841.

consumer was traveling uphill at 65 miles per hour on the highway when the engine "seized," and almost caused an accident. The GM service department stated that there was a "design flaw with the 6.2-liter engine" and that there were *two other trucks* at the dealer for the *same seized engine*. The dealer planned to "install a new engine with the same design flaw with the hopes it does not happen again."[39]



143.    On October 30, 2024, a consumer in Somers Connecticut experienced an engine failure event in their 2024 Chevrolet Suburban. The consumer was driving in the left lane of a two-lane highway at approximately 65-70 miles per hour when the engine failed without warning. The consumer coasted into the right lane downhill to reach the shoulder. The dealer "immediately" identified the issue as internal engine failure, which the consumer learned was a widespread problem with the 6.2 liter engines. They noted, "If this happens to the wrong person, someone is going to lose their life."[40]

---

[40]    Consumer Complaint No. 11622888, NHTSA (Oct. 31, 2024), https://www.nhtsa.gov/?nhtsaId=11622888.



October 31, 2024 NHTSA ID NUMBER: 11622888
**Components: ENGINE**

**NHTSA ID Number:** 11622888

**Incident Date** October 30, 2024

**Consumer Location** SOMERS, CT

**Vehicle Identification Number** 1GNSKGKL8RR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | While driving in the left lane of a two lane highway at highway speed of approx 65-70 mph the engine shut down. The instrument cluster said to "Press button to start engine". I had no power. There was no throttle response. Luckily I was on a slight decline and was able to safely change lanes by coasting into the right lane then the shoulder. I was able to put the vehicle into park. The vehicle did restart. I took the vehicle to a Chevrolet dealer and was immediately told that there was an internal engine failure. I could have been rear ended or worse. This is a very serious issue. Upon doing some research, I found that the same thing has happened to many other people. This is very dangerous. Apparently this is becoming a major issue for the GM 6.2l eco tec engine. I hope that the next person this happens to doesn't freak out and have an accident. If this happens to the wrong person, someone is going to lose their life. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product** -

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CHEVROLET | SUBURBAN | 2024 |

144.   On January 3, 2025, a consumer in Buffalo, Minnesota experienced an engine failure event in their 2023 GMC Sierra. The consumer's engine suddenly failed while traveling at 50 miles per hour on a narrow 2 lane road, *towing a 5,000-pound trailer*, *in sub-zero temperatures, and heavy winds*, along with their two dogs. There were no warning lights or indicators until "the final 2 seconds" before engine failure. The nearest police officer was an hour away, forcing the consumer to wait in dangerous weather and on a street with almost no shoulder, placing them at grave risk of injury or death. The consumer came to learn this was a "common issue" and

that there was a backorder on replacement engines due to high demand. The consumer noted "Had this happened to most other people, the narrative would have ended much differently."[41]



January 12, 2025 NHTSA ID NUMBER: 11635551

**Components: ENGINE**

**NHTSA ID Number:** 11635551

**Incident Date** January 3, 2025

**Consumer Location** BUFFALO, MN

**Vehicle Identification Number** 3GTUUEEL2PG****

**Summary of Complaint**

| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

I was driving on a rural and narrow 2 lane road with next to no shoulder when my engine started losing power. There were no check engine lights or other indicators of failure until the final 2 seconds. At that point, a message popped up on the dash stating something along the lines that my engine oil was too hot and to idle the engine. 2 seconds later, at 50mph my engine died. That is scary enough, but I was also towing a 5,000lb+ trailer, it was -3F, heavy winds, and I had my 2 dogs with me. Thankfully, I kept my wits about me, remained calm, and made it to the side of the road. As mentioned, there was not much shoulder so this put me in great danger of being hit by careless drivers speeding by. The nearest police officer was an hour away, so I was in quite a predicament. Had this happened to most other people, the narrative would have ended much differently. Come to find out, this is a common issue with these 6.2l engines. So much so, that there is a backorder on the engines due to the high replacement demand. This poses extreme danger not only "in the moment" of failure, but also the environmental dangers/risks users are potentially exposed to, just as I was. This needs to be a recall as this is a substantial and immediate safety issue in my opinion.

**1 Affected Product** –

**Vehicle**

| MAKE | MODEL | YEAR |
| --- | --- | --- |
| GMC | SIERRA 1500 | 2023 |

---

[41]   Consumer Complaint No. 11635551, NHTSA (Jan. 12, 2025), https://www.nhtsa.gov/?nhtsaId=11635551.

*Consumer complaints on other popular forums*

145.  Upon information and belief, GM also monitors consumer complaints and discussions of potential defects on other forums, such as carcomplaints.com.

146.  Consumer complaints from such forums demonstrate the same pattern of engine failures as the NHTSA complaints: sudden engine failures with no warning lights or alarms, sometimes briefly preceded by a knocking or clicking noise, drivers and occupants are exposed to hazardous situations, and dealer determinations involving the engine crankshaft, bearings, and/or connecting rods.

147.  As early as December 5, 2021, an owner of a 2021 Chevrolet Silverado with only 6,000 miles reported recurring engine failure on CarComplaints.com, and that their local dealer determined that "two rods had gone through the engine block and the engine needed to be replaced" and GM "was made aware of the failure."[42]

148.  In July of 2023, a consumer with the username cjlewis posted on tahoeyukonforum.com, in a thread titled, "Spun Crankshaft Bearing Cause?" that their 2023 GMC Yukon experienced engine failure that May, and they were "still

---

[42] *2021 Chevrolet Silverado 1500 Owner Comments*, CarComplaints.com, No. 23 (Dec. 5, 2021), https://www.carcomplaints.com/Chevrolet/Silverado_1500/2021/engine/engine-5.shtml (attached as Exhibit U).

waiting for a new engine. Their dealer stated there was a "nationwide backlog" for the 6.2-liter engines.[43]

149.    In a thread titled "L87 6.2L engine bearing failure" posted in September 2024 on Reddit.com, a user in Texas reported two engine failure experiences in their 2024 GMC Sierra, with only 4,4000 miles. The first failure occurred at a stop light, and the second while in motion, after which he was "luckily" able to coast to a shopping center parking lot. Their GMC dealer determined it was caused by "bearings seized up" and required full engine replacement. One user responded, "I've had 2 failures now in my 2021 Sierra Denali 6.2L. The first failure came at 19,000 miles and the second 2 weeks ago with only 61k on that motor. Both engines seized while driving. Its a serious problem." Another user responded, "I've replaced 5, 6.2L L87 engines in the last year. All front main bearing failure."[44]

150.    One 2023 Tahoe owner in Grass Lake, Michigan reported experiencing catastrophic engine failure on a freeway on November 24, 2024, and was unable to

---

[43] *Spun Crankshaft Bearing Cause?*, TahoeYukon Forum (July 14, 2023), https://www.tahoeyukonforum.com/threads/spun-crankshaft-bearing-cause.142697/ (attached as Exhibit V).

[44] *L87 6.2L engine bearing failure*, Reddit, https://www.reddit.com/r/gmcsierra/comments/-1fm1ypy/l87_62l_engine_bearing_failure/ (last visited May 16, 2025) (attached as Exhibit W).

reach a safe location. They reported, "[i]t was determined that the #7 crankshaft bearing was the cause of failure and the complete engine was replaced as a result." Another reported total engine failure on the interstate in September 2024 where "connecting rod bearing seized on crankshaft causing extensive metal contamination throughout engine." [45]

### F. GM Has Known About the L87 Engine Defect Since At Least 2017

151.    First, GM admitted it knew of the defect in 2021.

152.    For example, it admits it received field complaints starting in April 2021.

153.    GM also admits it *closed* its first formal investigation in February 2022, meaning it was launched in 2021. And formal investigations logically follow informal investigations, so GM's knowledge goes back further than when it launched its first formal investigation in 2021.

154.    GM also knew or should have known about the L87 Engine Defect from the testing performed on the Engines and its' components. Prior to the sale of any of the Class Vehicles, GM–like any other reasonable Original Equipment Manufacturer ("OEM") seeking to manufacture and sell vehicles on the U.S. market–completed a

---

[45] *2023 Chevrolet Tahoe Owner Comments*, CarComplaints.com, Nos.13, 16 (Nov. 24, 2024), https://www.carcomplaints.com/Chevrolet/Tahoe/2023/engine/engine-2.shtml (attached as Exhibit X).

multitude of analyses and testing that exposed the existence of the L87 Engine Defect.

155.   GM and its suppliers, perform various pre-production testing on new vehicle components, including most notably Failure Modes and Effects Analysis ("FMEA") and Design Validation Plan and Report ("DVP&R").

156.   GM and its suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure of the engines.

157.   FMEA tests methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail. For example, in testing the systems at issue here, FMEA testing would explore, among other things, how and under what conditions the engines, and their components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

158.   The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by GM, potential risks of failures and rank them by severity, likelihood and ability to detect failure. Any conditions resulting in failure, like those associated with the L87 Engine Defect would result in a "high

risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases. Given the reports of engine failures after sale, these processes were designed to show the various modes of failure caused by the L87 Engine Defect and confirm what GM already knew about the L87 Engine defect.

159.   The DVP&R phase includes an extensive battery of tests and other work necessary to validate the robustness of any design and includes three basic types of testing: bench scale, dynamometer, and vehicle/field testing. This testing is discussed below.

160.   Bench scale testing is component-specific and establishes a strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, the engine was "bench tested," that is, set up on various machinery to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with GM. Discovery is expected to reveal that GM received the detailed results of the bench testing and resulting Technical Control Documents (TCDs) which outline the operating limitations of the engine along with the potential risks associated with installation in the Class Vehicles, including the L87 Engine Defect. Similarly, discovery is expected to show that bench testing of the engines confirmed what GM already knew about its design

choice or its workmanship and materials—that the engines, including the rod bearing, fail to operate as intended and prematurely fail.

161. Dynamometer testing is one of the most important types of testing to ensure durability and performance of the powertrain and its components. In the dynamometer test, the powertrain operates under extreme conditions such as maximum temperatures, RPMs, or excessive vibration. Dynamometer testing is intended to demonstrate powertrain robustness and reveal necessary improvements or flaws, such as the L87 Engine Defect. Discovery is expected to confirm that dynamometer testing revealed the engines were poorly designed and manufactured, suffered from premature wear, underperformance, and, ultimately, catastrophic failure.

162. GM and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals. GM tested the engines in actual vehicles, both prototype vehicles and pre-production line vehicles. In these tests, vehicles are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public. These vehicle-specific development tests include mapping extreme operating conditions, which are the kinds of modes that manifest the L87 Engine Defect.

163.    Through the rigors of these three phases of DVP&R testing, the engines were exposed repeatedly to conditions that cause the L87 Engine Defect to manifest.

164.    During this testing, GM also learned that the Class Vehicles' engines grossly underperform and suffer internal component damage and failure. However, due to the costs of redesigning and fixing the engines, GM opted to conceal the defect.

165.    GM knew or should have known that the L87 Engine Defect was material to owners or lessees of the Class Vehicles and that Plaintiffs and Class Members could not reasonably discover the L87 Engine Defect on their own prior to purchasing or leasing the Class Vehicles.

166.    GM had and continues to have a duty to fully disclose the true nature of the L87 Engine Defect to Plaintiffs and Class Members, among other reasons, because the L87 Engine Defect poses an unreasonable safety hazard; because GM had and has exclusive knowledge or access to material facts about the Class Vehicles' engines that were and are not known to or reasonably discoverable by Plaintiffs and the other members of the Class; and because GM has actively concealed the L87 Engine Defect from its customers at the time of purchase or repair and thereafter.

167.    Specifically, GM had exclusive knowledge of the L87 Engine Defect and (a) failed to disclose, at the time of purchase or repair and thereafter, any and all

known material defects or material nonconformities of the Class Vehicles, including the L87 Engine Defect; (b) failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their engines were not in good working order, were defective and prone to failure, and were not fit for their intended purpose; and (c) failed to disclose and actively concealed the fact that the Class Vehicles and their engines were defective, despite the fact that GM learned of the L87 Engine Defect before it placed the Class Vehicles in the stream of commerce. GM failed to disclose this information to Plaintiffs and Class Members (as well as to its authorized Dealerships), although it could have through numerous avenues, including its website, marketing brochures, etc.

### G. GM Investigated Engine Failures in the L87 Engines for Years.

168.   As discussed above, GM knew there was a defect causing sudden engine failure in the Class Vehicles for years before issuing a recall in April 2025.

169.   GM also received reports about the L87 Engine failure defect, including diagnoses related to engine crankshafts, bearings, and/or connecting rods.

170.   Moreover, the details provided in consumer complaints are undeniably repetitive. The volume and pattern of consumer complaints alone did, or should have, caused GM to know of the L87 engine failure defect.

> a. Many consumers reported catastrophic engine failure not accompanied by any alerts, lights, or other warning signs.

b. Many consumers reported that catastrophic engine failure occurred early in the vehicle's lifespan, with very few miles on the vehicle.

c. Many consumers reported that the sudden engine failure occurred on highways or otherwise at high speeds, and that it nearly caused an accident.

171. Besides monitoring consumer complaints, GM was also directly aware of many consumer engine failure experiences regarding the L87 Engine failure defect. Indeed, many consumer complaints detail GM's direct involvement with consumers following engine failure and its ad hoc efforts to appease impacted consumers, evidencing GM's awareness of the problem. For example, three NHTSA complaints reported that GM: offered to "help with cost" to replace a defective engine[46], offered a $5,000 voucher toward the consumer's next vehicle,[47] and offered the option to trade in the vehicle to "help" but at a significant monetary loss to the consumer.[48]

---

[46] Consumer Complaint No. 11636156, NHTSA (Jan. 15, 2025), https://www.nhtsa.gov/?nhtsaId=11636156 (attached as Exhibit A).

[47] Consumer Complaint No. 11603421, NHTSA (July 19, 2024), https://www.nhtsa.gov/?nhtsaId=11603421 (attached as Exhibit A).

[48] Consumer Complaint No. 11640523, NHTSA (Feb. 3, 2025), https://www.nhtsa.gov/?nhtsaId=11640523 (attached as Exhibit A).

172.   GM divulged in the April 2025 recall report that it has conducted three prior investigations into the L87 Engine failure defect, which it closed in February 2022, June 2023, and July 2024 "based on the available safety field information." [49]

173.   GM offered no details of those prior investigations, or the findings, to the consumer and driving public.

174.   Between April 29, 2021, and February 3, 2025, GM received 28,102 field complaints or incidents in the US potentially related to failure of the L87 engine, including 12 potentially related alleged crashes and 12 potentially related alleged injuries.[50]

175.   On March 24, 2023, an article featured on Techlink.com, which GM owns and maintains, described an engine "condition" in "some 2019-2023 Silverado, Sierra; 2021-2023 Tahoe, Suburban, Yukon and Escalade models equipped with the 6.2L V8 engine (RPO L87)" involving main bearing failure in the crankshaft which may cause "seized engine." The article notes that "if the main bearing debris is sent through the oil galleries and other components are in the lubrication circuit… it could lead to additional damage when installed on a new engine."[51]

---

[49] Recall Report, *supra* note 3.

[50] *Id.*

[51] *V8 Engine Crankshaft Bearing Conditions*, TechLink (Mar. 24, 2023), https://gm-techlink.com/?p=17349 (attached as Exhibit Y).

## H. GM Touts the Safety and Reliability of the L87 Engine and Class Vehicles.

176.    GM repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality. In so doing, GM led consumers to believe that the Class Vehicles would be free from defects that result in engine damage and failure.

177.    No GM brochure, advertisement, or other marketing materials for or relating to the Class Vehicles alerted customers to the L87 Engine Defect and the problems arising therefrom.   Indeed, all such materials omitted the problem in all respects.

178.    Moreover, in its public statements, GM consistently proclaimed that the Class Vehicles were of the highest quality.

179.    GM consistently promoted all its vehicles as reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.

180.    GM knowingly omitted and concealed information about material defects in the Class Vehicles from the driving public, including Plaintiffs and the other Class members, thereby allowing unsuspecting vehicle owners and lessees to continue unknowingly driving defective vehicles that were of diminished value and bound to cause costly problems.

181.    GM intentionally and actively concealed the L87 Engine Defect.

## I. The Inspection and Service Bulletins Associated with the Recall Are Not an Adequate Remedy.

182.    GM instructed its dealers in an April 2025 service bulletin to inspect the Recall Vehicles for code P0016, a diagnostic trouble code associated with misalignment between the camshaft and crankshaft.[52] For the vehicles that do *not* present this problem code, GM instructed dealers to replace the factory fill oil (0W-20) for a higher viscosity oil (0W-40), replace the oil cap with one that is marked to indicate the higher viscosity oil is now required, and replace the oil filters on those vehicles passing this inspection.[53]

183.    GM has not explained why the oil-related service is required for Class Vehicles supposedly not qualifying as defective under the April 2025 recall.

184.    A change to a high viscosity oil will not remedy out of specification crankshaft dimensions and surface finish.

185.    For the Recall Vehicles inspected and presenting the problem code P0016, the April 2025 bulletin merely told dealers to await further instructions. In the meantime, Class Members had to drive their defective vehicles without available redress.

---

[52] Technical Service Bulletin N252494001: L87 Loss of Propulsion, General Motors (April 2025), https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-8641.pdf ("TSB N252494001") (attached as Exhibit F); Carley, *supra* note 20.

[53] TSB N252494001, *supra* note 52; Recall Report, *supra* note 3.

186.   GM released the second service bulletin on May 1, 2025 regarding replacement of engines in the Recall Vehicles. However, the bulletin only covered engine replacement for certain vehicles based on their vin numbers, which is a limited subset of the Recall Vehicles, and an even smaller subset of the Class Vehicles.[54]

187.   The list of vehicles qualifying for engine replacement under the May 1 service bulletin, does not cover all Class Vehicles with the L87 Engine failure defect.

188.   For the vehicles that are covered by second service bulletin, the service procedure does not provide an adequate remedy.

189.   Merely replacing a defective L87 engine with an engine of the same type does not provide an adequate remedy to Class Members, as several consumer have already reported, like the consumer in the NHTSA complaint below:[55]

---

[54] Technical Service Bulletin N252494002: L87 Loss of Propulsion, General Motors (May 2025), https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-2909.pdf ("TSB N252494002") (attached as Exhibit H).

[55]   Consumer   Complaint   No.   11655176,   NHTSA   (Apr.   17,   2025), https://www.nhtsa.gov/?nhtsaId=11655176 (attached as Exhibit A)



190.   One consumer reported to NHTSA on May 12, 2025 regarding their

2021 Chevrolet Silverado 1500:

> [T]his is 6.2 l 187 engine that is being recalled but this vin is not on list. already had lifters and rods replaced while back. coming home from trip truck made awful noise and I lost power on the interstate. thankfully was able to get out of traffic but waited 3.5 hours for tow. at dealer but cant tell me when they can look at it. 60,200 miles and they are saying well we will see what we can do but your powertrain warranty ended at 60k. [I] have had numerous problems and these are all known by gm especially 2021 6.2l.[56]

---

[56]   Consumer   Complaint   No.   11660510,   NHTSA   (May   12,   2025), https://www.nhtsa.gov/?nhtsaId=11660510 (attached as Exhibit A).

191.   Another consumer reported to NHTSA on May 7, 2025 regarding their 2023 Cadillac Escalade, describing a shortage of replacement engines:[57]

> GM advised no remedy could be found until service bulletin could be resolved. No repair work to be performed. To release to customer as is until engine replacement can be performed. So GM is forcing us to take back our vehicle on the road with a failing engine that needs replacement but due to not having enough stock to repair in timely fashion are placing us back on the road until one can become available.  This now opens us up for massive catastrophic failure with my family on the road and not to mention others on the highway and public road system. I'm astonished that GM would do this to their customers and jeopardize the safety of their customers and other citizens on the roads. Something has and needs to be done. They are now placing my family and other lives in danger to save money.

## V.   CLASS ALLEGATIONS

192.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

193.   Plaintiffs seek to represent the following Classes:

   a.   (**"The Nationwide Class"**): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the United States.

   b.   (**"The Nevada Class"**): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Nevada.

---

[57]   Consumer Complaint No. 11659460, NHTSA (May 7, 2025), https://www.nhtsa.gov/?nhtsaId=11659460 (attached as Exhibit A).

c. ("**The Massachusetts Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Massachusetts.

d. ("**The New York Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of New York.

e. ("**The Florida Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Florida.

f. ("**The Texas Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Texas.

g. ("**The Indiana Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Indiana.

h. ("**The Minnesota Class**"): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Minnesota.

i. (**"The Maryland Class"**): All current and former owners or lessees of one or more Class Vehicles (as defined herein) that purchased or leased in the State of Maryland.

194.   Excluded from the Classes are Defendant General Motors LLC and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

195.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

196.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.    The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of the Class, the precise number of Class Members is unknown to Plaintiffs, but may be ascertained from GM's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

197.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.      whether GM engaged in the conduct alleged herein;

b.      whether GM's alleged conduct violates applicable law;

c.      whether the L87 Engines contain the L87 Engine Defect;

d.      whether the L87 Engine Defect renders the Class Vehicles unmerchantable;

d.      whether GM misled Class members about the quality of the L87 Engines in the Class Vehicles;

f.      whether GM had actual or imputed knowledge about L87 Engine Defect but failed to disclose it to Plaintiffs and the other Class members;

g.      whether GM's omissions and concealment regarding L87 Engine Defect were likely to deceive Class members;

h.      whether GM breached its express warranty to the Class members with respect to the Class Vehicles;

i.      whether Class members overpaid for their Class Vehicles as a result of L87 Engine Defect;

j.      whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

k.      the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

198. **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the Class members purchased or leased Class Vehicles that contain defective GM 6.2 Liter V8 EcoTec3 L87 engines. Neither Plaintiffs nor the other Class Members would have purchased or leased the Class Vehicles, or would have paid less for the

Class Vehicles, had they known of the engine failure defect in the L87 Engines. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which GM engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

199. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

200. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

201. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the Class members to individually seek redress for GM's wrongful conduct.  Even if the Class members could afford litigation the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS FOR RELIEF

### A. Claims Brought on Behalf of the Nationwide Class

### COUNT 1
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*

202.   Plaintiffs repeat and reallege all other paragraphs in this Complaint as if fully set forth herein.

203.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

204.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

205.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

206.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

207.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

208.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

209.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

210.   GM's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

211.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of GM's written warranty and implied warranty became part of the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class members, on the other.

212.   GM breached these warranties, as described in more detail above, by selling Class Vehicles with the L87 Engine Defect.

213.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.   GM has not taken any measures to cure its warranty breaches to Plaintiffs and the other Class members.

214.   At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.   Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs and the other Class members resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

215.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

216.   As a direct and proximate result of GM's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class members have sustained damages in an amount to be determined at trial.

217.   Plaintiffs, individually and on behalf of all the other Class members, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

### B. Claims Brought on Behalf of the Massachusetts Class

### COUNT 2
### BREACH OF EXPRESS WARRANTY
### Mass Gen. Laws ch. 106, §§ 2-313 and 2A-210

218.   Plaintiffs Payzant, Marino, and Eastman ("Plaintiffs," for purposes of the Massachusetts Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

219.   Plaintiffs bring this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

220.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

221.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

222.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective L87 Engines.

223.   GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

224.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

225.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provided the promised remedies within a reasonable time.

226.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies allowable by law.

227.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

228.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and the other Class members' remedies would be insufficient to make them whole.

229.   As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212**

230.   Plaintiffs Payzant, Marino, and Eastman ("Plaintiffs," for purposes of the Massachusetts Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

231.   Plaintiffs bring this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

232.   GM is and was at all relevant times a merchant with respect to motor vehicles under Mass Gen. Laws ch. 106, §§ 2-104 and 2A-103.

233.   Pursuant to Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the

Class Vehicles were bought and sold subject to an implied warranty of merchantability.

234.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the L87 Engine Defect.

235.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

236.   Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the warranty of merchantability.

237.   As a direct and proximate result of GM's breach of the warranty of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 4
## FRAUDULENT OMISSION

238.   Plaintiffs Payzant, Marino, and Eastman ("Plaintiffs," for purposes of the Massachusetts Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

239.   Plaintiffs bring this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

240.   GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

241.   Having been aware of the L87 Engine Defect, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose the defect to Plaintiffs and the other members of the Class in connection with the sale or lease of the Class Vehicles.

242.   GM did not disclose the L87 Engine Defect to Plaintiffs and the other members of the Class in connection with the sale of the Class Vehicles.

243.   For the reasons set forth above, the L87 Engine Defect comprises material information with respect to the sale or lease of the Class Vehicles.

244.   In purchasing the Class Vehicles, Plaintiffs and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

245.   Had Plaintiffs and the other members of the Class known of the L87 Engine Defect, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

246.   Through its omissions regarding the L87 Engine Defect, GM intended to induce, and did induce, Plaintiffs and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

247.   As a direct and proximate result of GM's omissions, Plaintiffs and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 5
## UNJUST ENRICHMENT

248.   Plaintiffs Payzant, Marino, and Eastman ("Plaintiffs," for purposes of the Massachusetts Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

249.   Plaintiffs bring this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

250.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of L87 Engine Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

251.   GM has received and retained unjust benefits from Plaintiffs and the other members of the Class, and inequity has resulted.

252.    It is inequitable and unconscionable for GM to retain these benefits.

253.    Because GM concealed its fraud and deception, Plaintiffs and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

254.    GM knowingly accepted the unjust benefits of its wrongful conduct.

255.    As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the Class in an amount to be proven at trial.

**C. Claims Brought on Behalf of the New York Class**

**COUNT 6**
**VIOLATIONS OF NEW YORK**
**GENERAL BUSINESS LAW, DECEPTIVE ACTS AND PRACTICES**
**N.Y. GBL § 349**

256.    Joe Mbang ("Plaintiff," for purposes of the New York Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

257.    Plaintiff brings this count individually and on behalf of the other members of the New York Class (the "Class" for purposes of this Count).

258.    GM engaged in unlawful, unfair, and deceptive trade practices in violation of the New York Gen. Bus. Law § 349 by advertising, selling, and warranting the defective Class Vehicles.

259.    GM knew that the Class Vehicles suffered from the L87 Engine Defect.

260.   In advertising, selling, and warranting the Class Vehicles, GM omitted material facts concerning the L87 Engine Defect.  GM failed to give Plaintiff and the other Class members sufficient notice or warning regarding this defect.

261.   GM intended that Plaintiff and the other Class members rely upon GM's omissions when purchasing vehicles containing the L87 Engine Defect.

262.   Plaintiff and the other Class members were deceived by GM's concealment of the defect.

263.   GM's conduct was in commerce and affected commerce.

264.   As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, Plaintiff and the other Class members have been damaged and are entitled to recover actual and treble damages, as well as attorneys' fees and costs, and all other relief allowed under N.Y. Gen. Bus. Law § 349.

## COUNT 7
## BREACH OF EXPRESS WARRANTY
### N.Y. U.C.C. Law §§ 2-313 and 2-a-210

265.   Plaintiff Mbang ("Plaintiff," for purposes of the New York Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

266.   Plaintiff brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

267.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

268.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

269.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective L87 Engines.

270.   GM breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

271.   GM was also provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

272.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provided the promised remedies within a reasonable time.

273.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and

workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

274.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the GM Vehicles under false pretenses.

275.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

276.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 8**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**N.Y. U.C.C. Law §§ 2-314 and 2-a-212**

277.   Plaintiff Mbang ("Plaintiff," for purposes of the New York Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

278.   Plaintiff brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

279.   GM is and was at all relevant times a merchant with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-314 and 2-a-212.

280.   Pursuant to N.Y. U.C.C. Law §§ 2-314 and 2-a-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

281.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the L87 Engine Defect.

282.   GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

283.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the warranty of merchantability.

284.   As a direct and proximate result of GM's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 9
## FRAUDULENT OMISSION

285.   Plaintiff Mbang ("Plaintiff," for purposes of the New York Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

286.   Plaintiff brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

287.   GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

288.   Having been aware of the L87 Engine Defect, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose these defects to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

289. GM disclosed information concerning the reliability and performance of the Class Vehicles, but GM did not disclose L87 Engine Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

290. For the reasons set forth above, the existence of the L87 Engine Defect comprises material information with respect to the sale of the Class Vehicles.

291. In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

292. Had Plaintiff and the other members of the Class known of the L87 Engine Defect, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

293. Through its omission regarding the L87 Engine Defect, GM intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

294. As a direct and proximate result of GM's omission, Plaintiff and the other members of the Class either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the L87 Engine Defect had been disclosed to them, and therefore have incurred damages in an amount to be determined at trial.

## COUNT 10
## UNJUST ENRICHMENT

295.   Plaintiff Mbang ("Plaintiff," for purposes of the New York Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

296.   Plaintiff brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

297.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

298.   GM has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

299.   It is inequitable and unconscionable for GM to retain these benefits.

300.   Because GM concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

301.   GM knowingly accepted the unjust benefits of its wrongful conduct.

302.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

### D. Claims Brought on Behalf of the Florida Class

**COUNT 11**
**VIOLATIONS OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 502.201, *et seq.***

303.   Plaintiff Auer ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

304.   Plaintiff brings this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

305.   The Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201, et seq., states that, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

306.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

307.   GM's omissions regarding the L87 Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

308.   GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Oil Consumption Defect.

309.   Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

310.   Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

311.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

312.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiffs and the other Class members Class Vehicles with defective engines that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

313.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the L87 Engine Defect been disclosed.   Plaintiff and the other Class members also suffered diminished value of their vehicles.  Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, et seq.

## COUNT 12
## BREACH OF EXPRESS WARRANTY
### Fla. Stat. §§ 672.313 and 680.21

314.   Plaintiff Auer ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

315.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

316.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

317.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

318.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective L87 Engines.

319.   GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

320.   GM was provided notice of the Oil Consumption Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

321.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provided the promised remedies within a reasonable time.

322.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

323.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

324.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

325.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 13
## FRAUDULENT OMISSION

326.   Plaintiff Auer ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

327.    Plaintiff bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

328.    GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

329.    Having been aware of the L87 Engine Defect, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

330.    GM did not disclose the L87 Engine Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

331.    For the reasons set forth above, the L87 Engine Defect comprises material information with respect to the sale or lease of the Class Vehicles.

332.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

333.    Had Plaintiff and the other members of the Class known of the L87 Engine Defect, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

334.   Through its omissions regarding the L87 Engine Defect, GM intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

335.   As a direct and proximate result of GM's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 14**
**UNJUST ENRICHMENT**

336.   Plaintiff Auer ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

337.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

338.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

339.   GM has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

340.   It is inequitable and unconscionable for GM to retain these benefits.

341.   Because GM concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

342.   GM knowingly accepted the unjust benefits of its wrongful conduct.

343.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**E. Claims Brought on Behalf of the Nevada Class**

**COUNT 15**
**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**Nev. Rev. Stat. §§ 598.0903 *et seq.***

344.   Plaintiff Houchin ("Plaintiff," for purposes of the Nevada Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

345.   Plaintiff brings this Count individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

346.   The Nevada Deceptive Trade Practices Act prohibits "Represent[ing] that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." Nev. Rev.

Stat. Ann. § 598.0915(7). NDTPA further prohibits "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease . . .." Nev. Rev. Stat. Ann. § 598.0915(5).

347.   In the course of its business, GM omitted and suppressed material facts concerning the L87 Engine Defect. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the L87 Engine Defect, as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiff and other Nevada Class members to purchase the Class Vehicles, and to increase GM's revenue and profits.

348.   The facts omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiff and other Nevada Class members known of the L87 Engine Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

349.   Plaintiff and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of GM's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not get the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence

of GM's misrepresentations, fraud, deceptive practices, and omissions. GM's violations present a continuing risk to Plaintiff as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

350. GM is liable to Plaintiff and Nevada Class members for actual damages. Plaintiff and other Class members are also entitled to an award of punitive damages, given that GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others, as well as fees and costs.

## COUNT 16
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Nev. Rev. Stat. § 104.2314

351. Plaintiff Houchin ("Plaintiff," for purposes of the Nevada Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

352. Plaintiff brings this Count individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

353. Under Nev. Rev. Stat. Ann. § 104.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class members purchased or leased their Class Vehicles from GM.

354. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

355.   GM marketed the Class Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Nevada Class members' decisions to purchase the Class Vehicles.

356.   Plaintiff and other Nevada Class members purchased the Class Vehicles from GM, or through GM's authorized agents for retail sales. At all relevant times, GM was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

357.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased.

358.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

359.   GM knew about the defect in the Class Vehicles, allowing Class to cure their breach of warranty if it chose to do so.

360.   GM's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time

limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Nevada Class members. Among other things, Plaintiff and other Nevada Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Nevada Class members, and GM knew of the defect at the time of sale.

361.   Plaintiff and Nevada Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein. Affording GM a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

362.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

363.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT 17
## FRAUDULENT OMISSION

364.   Plaintiff Houchin ("Plaintiff," for purposes of the Nevada Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

365.   Plaintiff brings this Count individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

366.   GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

367.   Having been aware of the L87 Engine Defect and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

368.   GM did not disclose the L87 Engine Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

369.   For reasons set forth above, L87 Engine Defect concerns material information with respect to the sale or lease of the Class Vehicles.

370.   In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

371.   Had Plaintiff and the other Class members known of the L87 Engine Defect, they would not have purchased the Class Vehicles or would have paid less for the vehicles.

372.   Through its omissions regarding the L87 Engine Defect, GM intended

to induce—and did induce—Plaintiff and the other Class members to purchase a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

373.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them. Therefore, Plaintiff and the other Class members have incurred damages in an amount to be determined at trial.

## COUNT 18
## UNJUST ENRICHMENT

374.   Plaintiff Houchin ("Plaintiff," for purposes of the Nevada Class's claims) repeats and realleges all other paragraphs in this Complaint as if fully set forth herein.

375.   Plaintiff brings this Count individually and on behalf of the other members of the Nevada Class (the "Class," for purposes of this Count).

376.   GM has benefited from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

377.   GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

378.   It is inequitable and unconscionable for GM to retain these benefits.

379.   Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

380.   GM knowingly accepted the unjust benefits of its misconduct.

381.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be determined at trial.

**F.  Claims on Behalf of the Minnesota Class**

**COUNT 19**
**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**
**(Individually and on behalf of the Statewide Class)**

382.   Plaintiff Stolz realleges and incorporates by reference all preceding allegations as though fully set forth herein.

383.   Plaintiff brings this count under Minnesota law, individually and on behalf of the other members of the Class against the GM for the manufacturing, marketing and selling of the Class Vehicles.

384.   For purposes of this count, members of the Minnesota class shall be referred to as "Class Members."

385.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and 336.2A-103(3), and a "seller" of motor vehicles under § 336.2-103(1)(d).

386.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

387.   All Class Members who purchased Class Vehicles in Minnesota are "buyers" within the meaning of Minn. Stat. § 336.2-103(1)(a).

388.   All Class Members who leased Class Vehicles in Minnesota are "lessees" within the meaning of Minn. Stat. § 336.2A-103(1)(n).

389.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

390.   GM issued an express written warranty for each defective Class Vehicle they sold, including that:

    a.  The Class Vehicles would be free of defects in materials and workmanship at the time of sale; and

    b.  The Class Vehicles were safe and reliable, and their engines would function properly and not fail prematurely.

391.   The warranties listed above formed the basis of the bargain with regard to Plaintiff's and Class Members' purchase and lease of the Class Vehicles.

392.   GM knowingly breached its warranty for the Class Vehicles because:

a. The Class Vehicles' engines have latent defects which causes abnormal engine knocking and engine performance issues, including hesitation, high RPMs, abnormal shifting, reduced proposed, no restart-condition, and complete engine failure; and

b. GM denied, concealed, and misrepresented the L87 Engine Defect, in the process refusing to pay for or provide in a reasonably timely fashion the needed repairs and replacements for Plaintiff and Class Members.

393.   GM knew or should have known that the warranties were false and/or misleading. Specifically, GM was aware of the L87 Engine Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Class Members.

394.   Plaintiff and Class Members were exposed to GM's misrepresentations, and they had no way of discerning that GM's representations were false and misleading or otherwise learning the material facts that GM had concealed or failed to disclose. Accordingly, Plaintiff and Class Members reasonably relied on GM's express warranties when purchasing or leasing their Class Vehicles.

395.   Plaintiff and Class Members timely provided GM notice of the issues raised in this count and this Complaint and an opportunity to cure, as alleged in the paragraphs addressing GM's notice above.

396.   Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach, because it would have been futile. As alleged above, GM knew about the L87 Engine Defect for years; however, to date, GM has not instituted a recall or any other repair program with respect to all of the Class Vehicles or even acknowledged that the L87 Engine Defect exists in all of the Class Vehicles. Therefore, they have refused to recall or repair defective vehicles.

397.   As a direct and proximate result of GM's breach of its express warranties, the Class Vehicles were and are defective and the L87 Engine Defect was not remedied. Therefore, Plaintiff and Class Members have been damaged, in an amount to be proven at trial, through their overpayment at the time of purchase or lease for the Class Vehicles with an undisclosed safety defect that would not be remedied.

### COUNT 20
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Minn. Stat. §§ 336.2-314 and 336.2A-212)
#### (Individually and on behalf of the Statewide Class)

398.   Plaintiff Stolz realleges and incorporates by reference all preceding allegations as though fully set forth herein.

399.   Plaintiff brings this count under Minnesota law, individually and on behalf of the other members of the Minnesota class against GM for the manufacturing, marketing and selling of the Class Vehicles.

400.   For purposes of this count, members of the Minnesota class shall be referred to as "Class Members."

401.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

402.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and 336.2A-103(3), and a "seller" of motor vehicles under § 336.2-103(1)(d).

403.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

404.   All Class Members who purchased Class Vehicles in Minnesota are "buyers" within the meaning of Minn. Stat. § 336.2-103(1)(a),

405.   All Class Members who leased Class Vehicles in Minnesota are "lessees" within the meaning of Minn. Stat. § 336.2A-103(1)(n).

406.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

407.   The Class Vehicles are not merchantable, and as such GM breached its implied warranties, because at the time of sale and all times thereafter:

> a. The Class Vehicles would not pass without objection in the automotive trade given the Engine Defect;

b. The L87 Engine Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

c. The Class Vehicles and the engines therein were inadequately labeled as safe and reliable, and the labeling failed to disclose the Engine Defect; and

d. The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

408. Plaintiff and Class Members timely provided GM notice of the issues raised in this count and this Complaint and an opportunity to cure, as alleged in the paragraphs addressing GM's notice above.

409. Alternatively, Plaintiff and Class Members were excused from providing GM with notice and an opportunity to cure the breach because it would have been futile. As alleged above, GM has long known that the Class Vehicles contained the L87 Engine Defect causing the engines to run rough, misfire, overheat, and the vehicle to lose motive power, stall while being driven, or become inoperable. However, to date, GM has not instituted a recall or any other repair program with respect to all of the Class Vehicles or even acknowledged that the L87 Engine Defect exists in all of those Class Vehicles.

410.   Plaintiff, individually and on behalf of Class Members, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**COUNT 21**
**VIOLATIONS OF MINNESOTA'S**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325D.44, Subd. 1, et seq.)**
**(Individually and on behalf of the Statewide Class)**

411.   Plaintiff Stolz realleges and incorporates by reference all preceding allegations as though fully set forth herein.

412.   Plaintiff brings this count under Minnesota law, individually and on behalf of the other members of the Minnesota class against GM or the manufacturing, marketing and selling of the Class Vehicles.

413.   For purposes of this count, members of the Minnesota class shall be referred to as "Class Members."

414.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. Minn. Stat. § 325D.44, Subd. 1.

415.   GM, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles and the Engine Defect, as detailed above.

416.   GM had an ongoing duty to Plaintiff and Class Members to refrain from unfair or deceptive practices under the Minnesota DTPA in the course of their business. Specifically, GM owed Plaintiff and Class Members a duty to disclose all the material facts concerning the L87 Engine Defect in the Class Vehicles because:

a.   Given GM's role in the design, manufacture, and testing of the Class Vehicles and the engines installed in them, and its experience and knowledge as experts and long-time veterans of the automotive industry, it possessed exclusive access to and were in a superior position to know the true facts about the Engine Defect;

b.   Given the Engine Defect's hidden and technical nature, Plaintiff and Class Members lack the sophisticated expertise in vehicle components and technology that would be necessary to discover the L87 Engine Defect on their own;

c.   GM knew that the L87 Engine Defect gave rise to serious safety concerns for the consumers who purchased and leased the Class Vehicles;

d.   The L87 Engine Defect poses a severe risk of harm in that, among other things, it causes abnormal engine knocking and engine performance issues, including hesitation, high RPMs,

abnormal shifting, reduced proposed, no restart-condition, and complete engine failure;

e.  GM knew about and investigated the Engine Defect, but then did not notify consumers about it or disclose the L87 Engine Defect to NHTSA, and GM did not launch a comprehensive recall for all Class Vehicles, all of which individually and together deprived Plaintiff of an opportunity that otherwise could have led them to discover the truth about the L87 Engine Defect in their Class Vehicles; and

f.  GM made, helped to make, or conspired to make incomplete representations about the safety and reliability of the Class Vehicles and their engines, while purposefully withholding material facts about a known safety defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, GM had the duty to disclose the whole truth.

417.  By misrepresenting the Class Vehicles as safe and reliable and the engines installed in them as properly functioning and free from defects, and/or by failing to disclose and actively concealing the dangers and risk posed by the L87 Engine Defect to both consumers and NHTSA, GM engaged in one or more of the

following unfair or deceptive business practices prohibited by Minn. Stat. § 325D.44, Subd. 1:

a. Causing likelihood of confusion or misunderstanding as the approval or certification of the Class Vehicles and the engines installed in them;

b. Representing that the Class Vehicles and/or the engines had a characteristic that they did not actually have—i.e., that the vehicles were safe and suitable for use on the roadway, when, in fact, they were not because their engines were defectively designed such that they had an unreasonably dangerous propensity to prematurely fail;

c. Representing that the Class Vehicles and the engines installed in them were of a particular quality, grade, or standard when, in fact, they were not of that quality, grade, or standard;

d. Failing to market, distribute, sell, and lease the Class Vehicles equipped with defective engines in accordance with GM's previous representations—i.e., that the Class Vehicles were safe and suitable for their intended use, when, in fact, they were not because of the Engine Defect; and

e. Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

1. Minn. Stat. §§ 325D.44, Subd. 1(1) (5), (7), (9), and (13).

418. GM's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had properly-functioning and reliable engines. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of the Class Vehicles and/or the engines installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

419. GM intended for Plaintiff and Class Members to rely on its misrepresentations, omissions, and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an L87 Engine Defect that would affect the quality, reliability, and safety of the Class Vehicles and their engines.

420. GM's misrepresentations, concealments, omissions, and suppressions of material facts regarding the L87 Engine Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiff and Class Members to

purchase and lease those vehicles, as GM intended. Plaintiff and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on GM's misrepresentations that the Class Vehicles and their engines were safe and reliable in deciding to purchase and lease the Class Vehicles.

421.   Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel GM's deception on their own.

422.   Had they known the truth about the Engine Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

423.   As a direct and proximate result of GM's deceptive practices, Plaintiff and Class Members have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of GM's actions and omissions alleged above— that first occurred at the time each Class Vehicle was purchased or leased.

424. GM's violations present a continuing risk to Plaintiff and Class Members, as well as to the general public, because the Class Vehicles remain unsafe

due to the L87 Engine Defect therein. GM's unlawful acts and practices complained of herein affect the public interest.

425.    Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Plaintiff and Class Members seek an order enjoining GM's unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to them any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the Minnesota DTPA.

426.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages enters judgment on them in favor of the GM's, Plaintiff will have no adequate legal remedy.

## COUNT 22
## Unjust Enrichment
### (Individually and on behalf of the Statewide Class)

427.    Plaintiff Stolz incorporates and realleges each preceding paragraph as though fully set forth herein.

428.    Plaintiff brings this count on behalf of himself and the other members of the Class.

429.   Plaintiff and the other members of the Class conferred a benefit on GM by leasing or purchasing the Class Vehicles. GM was and should have been reasonably expected to provide Class Vehicles free from the Engine Defect.

430.   GM unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions, and concealment of the L87 Engine Defect in the Class Vehicles.

431.   As a proximate result of GM's false representations, omissions, and concealment of the L87 Engine Defect in the Class Vehicles, and as a result of GM's ill-gotten gains, benefits and profits, GM has been unjustly enriched at the expense of Plaintiff and the other Class Members. It would be inequitable for GM to retain their ill-gotten profits without paying the value thereof to Plaintiff and the other Class Members.

432.   There is a direct relationship between GM on the one hand, and Plaintiff and the other Class Members on the other, sufficient to support a claim for unjust enrichment.  GM failed to disclose the L87 Engine Defect to improve retail sales, which in turn improved wholesale sales. Conversely, GM knew that disclosure of the L87 Engine Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of GM's brand among Plaintiff and the other Class Members. GM also knew its concealment and suppression of the L87 Engine Defect would discourage

Plaintiffs and the other Class Members from seeking replacement or repair concerning the Engine Defect, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

433.   Plaintiff and the other Class Members are entitled to restitution of the amount of GM's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

434.   Plaintiff and the other Class Members seek an order requiring GM to disgorge their gains and profits to Plaintiff and the other Class Members, together with interest, in a manner to be determined by the Court.

**G. Claims on Behalf of the Maryland Class**

**COUNT 23**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Ann., Com. Law §§ 13-101 et seq. ("MCPA")**

435.   Plaintiff Toliver ("Plaintiff," for purposes of the Maryland Class's claims) incorporates by reference each allegation as if fully set forth herein.

436.   Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

437.   The MCPA prohibits "any [f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301(1). The MCPA also prohibits any "[d]eception,

fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods." Md. Code Ann., Com. Law § 13-301(9) – 13-301(9)(i).

438.   Plaintiff and the Maryland Class are "consumers" within the meaning of the MCPA. Md. Code Ann., Com. Law § 13-101(c).

439.   GM is a "person" as used in the MCPA.  Md. Code Ann., Com. Law § 13-101(h).

440.   The Class Vehicles are "consumer good[s]" within the meaning of the MCPA.  Md. Code Ann., Com. Law § 13-101(d).

441.   By the conduct described in detail above and incorporated herein, GM violated the MCPA.

442.   GM's omissions regarding the L87 Engine Defect, described above are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) a Class Vehicle.

443.   GM's omissions regarding the L87 Engine Defect were likely to deceive a consumer acting reasonably in the same circumstances as Plaintiff and the other Class members.

444.   GM intended for Plaintiff and the other Class members to rely on GM's omissions of fact regarding the L87 Engine Defect.

445.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect, as evidenced by Plaintiff's and the other Class members' purchase of their vehicles.

446.    Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and the other Class members, then they would not have purchased or leased the vehicle or would have paid less to do so.

447.    GM's omissions deceived Plaintiff and the other Class members.

448.    GM acted willfully in not disclosing the L87 Engine Defect from Plaintiff and the other Class members.

449.    GM's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

450.    Plaintiff and the other Class members suffered ascertainable loss and actual damages as a direct result of GM's failure to disclose the L87 Engine Defect Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed.

451.    GM's violations present a continuing risk to Plaintiff and the Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

452. Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiff and the Maryland Class seek actual damages, attorneys' fees, and any other just and proper relief available under the MCPA, Md. Code Ann., Com. Law § 13-301, et seq.

## COUNT 24
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Md. Code Ann., Com. Law §§ 2-314 et seq.

453. Plaintiff Toliver ("Plaintiff," for purposes of the Maryland Class's claims) incorporates by reference each allegation as if fully set forth herein.

454. Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

455. GM is a "seller" as defined by Md. Code Ann., Com. Law § 2-314(1)(a).

456. Under Md. Code Ann., Com. Law § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Class members purchased or leased their Class Vehicles from GM.

457. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

458. GM marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the

bargain in Plaintiff's and Maryland Class members' decisions to purchase the Class Vehicles.

459.   Although privity is not required under Md. Code Ann., Com. Law § 2-314, Plaintiff and other Maryland Class members purchased the Class Vehicles from GM, or through GM's authorized agents for retail sales. At all relevant times, GM was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

460.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased.

461.   Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

462.   GM knew about the defect in the Class Vehicles, allowing Class to cure their breach of warranty if it chose to do so.

463.   GM's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Maryland Class members. Among other things, Plaintiff and other Maryland Class members had no meaningful choice in determining these

time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Maryland Class members, and GM knew of the defect at the time of sale.

464.    Plaintiff and Maryland Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein. Affording GM a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

465.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

466.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT 25
## FRAUDULENT OMISSION

467.    Plaintiff Toliver ("Plaintiff," for purposes of the Maryland Class's claims) incorporates by reference each allegation as if fully set forth herein.

468.    Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

469.    GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

470.    Having been aware of the L87 Engine Defect and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

471.    GM did not disclose the L87 Engine Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

472.    For reasons set forth above, the L87 Engine Defect concerns material information with respect to the sale or lease of the Class Vehicles.

473.    In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

474.    Had Plaintiff and the other Class members known of the L87 Engine Defect, they would not have purchased the Class Vehicles or would have paid less for the vehicles.

475.    Through its omissions regarding the L87 Engine Defect, GM intended to induce—and did induce—Plaintiff and the other Class members to purchase a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

476.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them. Therefore, Plaintiff and the other Class members have incurred damages in an amount to be determined at trial.

## COUNT 26
## UNJUST ENRICHMENT

477.   Plaintiff Toliver ("Plaintiff," for purposes of the Maryland Class's claims) incorporates by reference each allegation as if fully set forth herein.

478.   Plaintiff brings this Count individually and on behalf of the other members of the Maryland Class (the "Class," for purposes of this Count).

479.   GM has benefited from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

480.   GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

481.   It is inequitable and unconscionable for GM to retain these benefits.

482.   Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

483.   GM knowingly accepted the unjust benefits of its misconduct.

484.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be determined at trial.

### H. Claims on Behalf of the Texas Class

**COUNT 27**
**BREACH OF EXPRESS WARRANTY**
**(TEX. BUS. & COM. CODE §§ 2.313 AND 2A.210)**

485.   Plaintiff Sydow ("Plaintiff" for purposes of the Texas Class's claims) incorporate by reference each allegation set forth in paragraphs 1-__.

486.   Plaintiff brings this Count individually and on behalf of the Texas Class (the "Class," for purposes of this Count).

487.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

488.   In its Limited Warranty, GM expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

489.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles.

490. GM breached its express warranty to repair defective parts in the Class Vehicles. GM has not repaired the Class Vehicles' L87 Engine Defect.

491. GM was provided notice of the L7 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. GM has not remedied its breach.

492. Further, GM has refused to provide an adequate warranty repair for the L87 Engine Defect, thus rendering the satisfaction of any notice requirement futile.

493. The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

494. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

495. Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the GM Vehicles under false pretenses.

496.    As a direct and proximate result of GM's breach of its express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 28**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tex. Bus. & Com. Code Ann. §§ 2.101 et seq.)**

497.    Plaintiff Sydow ("Plaintiff," for purposes of the Texas Class's claims) incorporates by reference each allegation as if fully set forth herein.

498.    Plaintiff brings this count individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

499.    GM is and was at all relevant time a "seller" of motor vehicles under Tex. Bus. & Com. Code § 2.103(a)(4), and a "merchant" with respect to motor vehicles within the meaning of §§ 2.104(1) and 2A.103(a)(20).

500.    With respect to leases, GM is and was at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

501.    Plaintiff and the members of the Class are and were at all relevant times "buyers" with respect to the Class Vehicles under Tex. Bus. & Com. Code § 2.313(a).

502.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

503. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314, 2.315 and 2A.212.

504. Plaintiff purchased their Class Vehicles from GM and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

505. There is privity because Plaintiff and the other Class members' dealerships were agents of GM. Namely, upon information and belief, GM controlled the marketing and sale of the Class Vehicles, GM set the MSRP and controlled any dealership incentives which may have been available.

506. GM breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

507. GM has actual knowledge of the L87 Engine Defect as alleged herein, satisfying any notice requirement.

508. The New Vehicle Limited Warranty fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

Accordingly, the implied warranty of merchantability is not limited to the Limited Warranty period.

509.   Any attempt by GM to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and members of the Class, and GM knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Defect posed a safety hazard.

510.   As a direct and proximate result of the L87 Engine Defect, Plaintiff did not receive the benefit of their bargain and have suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

## COUNT 29
## FRAUDULENT OMISSION

511.   Plaintiff Sydow ("Plaintiff," for purposes of the Texas Class's claims) incorporates by reference each allegation as if fully set forth herein.

512.   Plaintiff brings this count individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

513.   GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

514.   Having been aware of the L87 Engine Defect and having known that Plaintiff and the other Class members could not have reasonably been expected to know of this defect, GM had a duty to disclose the L87 Engine Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

515.   Further, GM had a duty to disclose the L87 Engine Defect because disclosure of the L87 Engine Defect was necessary to dispel misleading impressions about the Class Vehicles' safety that were or might have been created by partial representation of the facts. Specifically, GM promoted, through its advertisements available to all Class members, that the vehicles were safe. GM also disclosed information concerning the Class Vehicles in window stickers associated with the Class Vehicles, without disclosing that these vehicles contained the L87 Engine Defect.

516.   GM did not disclose the L87 Engine Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

517.   For the reasons set forth above, the L87 Engine Defect comprises material information with respect to the sale or lease of the Class Vehicles.

518.   In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

519.   Had Plaintiff and the other Class members known of the L87 Engine Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

520.   GM's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

521.   Through its omissions regarding the L87 Engine Defect, GM intended to induce—and did induce—Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased or leased and/or to pay more for a Class Vehicle than they otherwise would have paid.

522.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles if the L87 Engine Defect had been disclosed to them. Therefore, Plaintiff and the other Class members have incurred damages in an amount to be determined at trial.

**COUNT 30**
**UNJUST ENRICHMENT**

523.   Plaintiff Sydow ("Plaintiff," for purposes of the Texas Class's claims) incorporates by reference each allegation as if fully set forth herein.

524.   Plaintiff brings this count individually and on behalf of all members of the Texas Class (the "Class," for purposes of this Count).

525.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

526.   GM has received and retained unjust benefits from Plaintiff and other Class members, and inequity has resulted.

527.   It is inequitable and unconscionable for GM to retain these benefits.

528.   Because GM concealed its fraud and deception, Plaintiff and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

529.   GM knowingly accepted the unjust benefits of its wrongful conduct.

530.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

## I.  Claims Brougt on Behalf of the Indiana Class

### COUNT 31
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMERS SALES ACT
### (Ind. Code Ann. §§ 24-5-0.5-1 et seq.)

531.   Plaintiff Kern ("Plaintiff," for purposes of the Indiana Class's claims) incorporates by reference each allegation as if fully set forth herein.

532.   Plaintiff brings this Count individually and on behalf of the other members of the Indiana Class (the "Class," for purposes of this Count).

533.   GM, Plaintiff, and the other Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2).  GM is a "supplier" as defined by Ind. Code § 24-5-0.5-2(a)(3).

534.   Plaintiff's and the other Class members' purchase and lease of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

535.   The Indiana Deceptive Consumer Sales Act ("IDCSA") prohibits suppliers from engaging in an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3.

536.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of Ind. Code § 24-5-0.5-3.

537. GM's omissions regarding the L87 Engine Defect described above concern material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

538. GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Idle Stop Defect.

539. Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described L87 Engine Defect as evidenced by Plaintiff's and the other Class members' purchases of Class vehicles.

540. Had GM disclosed all material information regarding the L87 Engine Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

541. GM's omissions deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and other members of the Class.

542. In addition to being deceptive, GM's business practices were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and

greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the L87 Engine Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

543.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles or alternatively would have paid less for them had the truth about the L87 Engine Defect been disclosed. Plaintiffs and the other Class members also suffered diminished value of their vehicles.

544.   GM is liable to Plaintiffs and the other Class members for compensatory damages and attorneys' fees pursuant to Ind. Code § 24-5-0.5-4, and any other just and proper relief under the IDCSA.

545.   Moreover, because GM's deceptive acts were carried out as part of a scheme with the intent to defraud Plaintiffs and the other Class members, its actions with regard to the L87 Engine Defect represent incurable deceptive acts.  Therefore, Plaintiffs are not required to give pre-suit notice pursuant to Ind. Code § 24-5-0.5-2(a)(8).

**COUNT 32**
**BREACH OF EXPRESS WARRANTY**
**Ind. Code §§ 26-1-2-313 and 26-1-2.1-210**

546.   Plaintiff Kern ("Plaintiff, for purposes of the Indiana Class's claims) repeats and realleges paragraphs 1-__, as if fully set forth herein.

547.   Plaintiff brings this Count individually and on behalf of the other Indiana Class members (the "Class," for purposes of this count).

548.   GM is and was at all relevant times a merchant with respect to the Class Vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

549.   With respect to leases, GM is and was all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

550.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

551.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  GM provides the following relevant language in its Limited Warranty guides for the Class Vehicles:

552.   This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

553.   As further stated in the Limited Warranty guide, "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period."

554.   As further stated, warranty repairs, including towing, parts, and labor, will be made at no charge.

555.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective engines.

556.   GM breached the express warranty to repair "any defect" by failing to repair the L87 Engine Defect.

557.   Further, to the extent that the Limited Warranty is construed to be limited to vehicle defects related to materials or workmanship, GM has breached the Limited Warranty.

558.   The L87 Engine Defect is a uniform design defect that is related to materials.

559.   GM has not repaired, and has been unable to repair, the L87 Engine Defect.

560. GM was provided notice of the L87 Engine Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

561. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

562. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

563. Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

564. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such

limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

565. As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 33
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)

566. Plaintiff Kern ("Plaintiff," for purposes of the Indiana Class's claims) incorporates by reference each allegation as if fully set forth herein.

567. Plaintiff brings this Count individually and on behalf of the other members of the Indiana Class (the "Class," for purposes of this Count).

568. GM was at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d). With respect to leases, GM was at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

569. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

570. The Class Vehicles, when sold or leased and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

571. GM marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Indiana Class members' decisions to purchase the Class Vehicles.

572. Plaintiff and other Indiana Class members purchased the Class Vehicles from GM, or through GM's authorized agents for retail sales. At all relevant times, GM was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

573. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased.

574. Because of the L87 Engine Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

575. GM knew about the defect in the Class Vehicles, allowing GM to cure their breach of warranty if it chose to do so.

576. GM's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, GM's warranty limitations are unenforceable because they knowingly

sold a defective product without informing consumers about the defect. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Indiana Class members. Among other things, Plaintiff and other Indiana Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Indiana Class members, and GM knew of the defect at the time of sale.

577.   Plaintiff and Indiana Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein. Affording GM a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

578.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

579.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT 34
## FRAUDULENT OMISSION

580.   Plaintiff Kern ("Plaintiff," for purposes of the Indiana Class's claims) incorporates by reference each allegation as if fully set forth herein.

581.   Plaintiff brings this Count individually and on behalf of the other members of the Indiana Class (the "Class," for purposes of this Count).

582.   GM was aware of the L87 Engine Defect when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

583.   Having been aware of the L87 Engine Defect in the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the L87 Engine Defect, GM had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

584.   GM did not disclose the L87 Engine Defect in the Class Vehicles to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

585.   For the reasons set forth above, the L87 Engine Defect concerns material information with respect to the sale or lease of the Class Vehicles.

586.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

587.   Through its omissions regarding the L87 Engine Defect, GM intended to induce and did induce Plaintiff and the other members of the Class to either

purchase a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

588.   As a direct and proximate result of GM's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the L87 Engine Defect had been disclosed to them and therefore have incurred damages in an amount to be determined at trial.

## COUNT 35
## UNJUST ENRICHMENT

589.   Plaintiff Kern ("Plaintiff," for purposes of the Indiana Class's claims) incorporates by reference each allegation as if fully set forth herein.

590.   Plaintiff brings this Count individually and on behalf of the other members of the Indiana Class (the "Class," for purposes of this Count).

591.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the L87 Engine Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

592.   GM has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

593.   It is inequitable and unconscionable for GM to retain these benefits.

594.    Because GM concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

595.    GM knowingly accepted the unjust benefits of its misconduct.

596.    As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the nationwide class and the statewide classes they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against Defendant, General Motors LLC, as follows:

1.    Declaring that this action is a proper class action, certifying the nationwide and statewide Classes as requested herein, designating Plaintiffs as nationwide and statewide class representatives, and appointing Plaintiffs' attorneys as class counsel;

2.    Enjoining GM from continuing the unfair business practices alleged in this Complaint;

3.      Ordering GM to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other nationwide and statewide class members, as allowable by law;

4.      Ordering GM to pay both pre- and post-judgment interest on any amounts awarded;

5.      Ordering GM to pay attorneys' fees and costs of suit; and

6.      Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

**DATED:** May 16, 2025

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Dana E. Fraser (P82873)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
Madeline E. Hill
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com

dferri@dicellolevitt.com
mhills@dicellolevitt.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
J. Mitch Williams
Dylan T, Martin
Trenton H. Mann
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com
Mitch.Williams@BeasleyAllen.com
Dylan.Martin@BeasleyAllen.com
Trent.Mann@BeasleyAllen.com

Timothy G. Blood
Thomas J. O'Reardon II
Paula R. Brown
Adam M. Bucci
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, California  92101
Telephone: 619-338-1100
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com
abucci@bholaw.com

Nicholas H. Wooten
**CHEELEY LAW GROUP, LLC**
2500 Old Milton Parkway
Alpharetta, GA  30009
(770) 814-7001
nick@cheeleylawgroup.com